Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio ▾

_____ Division

Andrew Smigelski

Case No. 2  2 0 C V 4 8 1 2

*(to be filled in by the Clerk's Office)*

**Plaintiff(s)**
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

Jury Trial: *(check one)* ☑ Yes ☐ No

-v-

See Attached

# Judge Morrison

## MAGISTRATE JUDGE JOLSON

**Defendant(s)**
*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names. Do not include addresses here.)*

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Page 1 of 6

**Defendants**

Logan Police Detective Gregg Cluley

Former Logan Police Officer Josh Mowery

Logan Police Captain Ryan Gabriel

Logan Police Detective Ben Skinner

Logan Patrol Supervisor - Michael Walton

Logan Police Chief Jerry Mellinger

Logan Police Dispatcher Lacy Levering

Logan City Law Director Abigail Saving

Hocking County Judge Jonah Saving

Logan Mayor Greg Fraunfelter

City of Logan, Ohio

Hocking County Sheriff's Deputy Caleb Moritz

Hocking County Sheriff Lanny North

Hocking Sheriff's Department

Hocking County

Southeast Ohio Regional Jail (as an entity as well as the guards individually)

Unknown named agents at the Athens FBI (all)

Unknown named agents at the Cincinnati FBI who were aware of the conduct of the Athens FBI

Federal Bureau of Investigation

Ken and Jessica Janes

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | | | |
|---|---|---|---|
| Name | Andrew Smigelski | | |
| Address | 1015 Bryan Road | | |
| | Sugar Grove | OH | 43155 |
| | *City* | *State* | *Zip Code* |
| County | Fairfield | | |
| Telephone Number | 614-607-1230 | | |
| E-Mail Address | | | |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | | | |
|---|---|---|---|
| Name | | | |
| Job or Title *(if known)* | | | |
| Address | | | |
| | *City* | *State* | *Zip Code* |
| County | | | |
| Telephone Number | | | |
| E-Mail Address *(if known)* | | | |

☐ Individual capacity ☐ Official capacity

Defendant No. 2

| | | | |
|---|---|---|---|
| Name | | | |
| Job or Title *(if known)* | | | |
| Address | | | |
| | *City* | *State* | *Zip Code* |
| County | | | |
| Telephone Number | | | |
| E-Mail Address *(if known)* | | | |

☐ Individual capacity ☐ Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

Defendant No. 3

    Name

    Job or Title *(if known)*

    Address

|  | City | State | Zip Code |
|---|---|---|---|

    County

    Telephone Number

    E-Mail Address *(if known)*

    ☐ Individual capacity    ☐ Official capacity

Defendant No. 4

    Name

    Job or Title *(if known)*

    Address

|  | City | State | Zip Code |
|---|---|---|---|

    County

    Telephone Number

    E-Mail Address *(if known)*

    ☐ Individual capacity    ☐ Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

    ☑ Federal officials (a *Bivens* claim)

    ☑ State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials? Of the United States Constitution: First amendment, Second amendment, Fourth amendment, Sixth Amendment, Eighth Amendment, Fourteenth Amendment
-Invasion of Privacy, Excessive Force, Trespassing, Failure to Intervene, Negligent Supervision Americans with Disabilites Act

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

First Amendment, Fourth Amendment

D.  Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.
Every named defendant committed the civil/constitutional rights violations while working within the official context of their employment in the local, state, and federal agencies. These violations were committed while the government employees were directly drawing a financial hourly/salary benefit from the public institution of their employment.

## III.  Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.  Where did the events giving rise to your claim(s) occur?
My home in Logan Ohio, Officer Mowery's police cruiser, the Southeast Ohio Regional Jail, and the Hocking County Municipal Court

B.  What date and approximate time did the events giving rise to your claim(s) occur?
September 12, 2018 - September 2019.

C.  What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*
See Attached

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## IV.  Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.
See Attached

## V.  Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.
Declaratory Judgment

Compensatory damages

Punitive damages

Equitable relief

Legal fees and costs

Discretionary Damages

Injunctive relief compelling the Ohio Public Defender's Office, ACLU, Department of Justice Civil Rights Division or other disinterested, competent, capable, and qualified, legal review organization to review all cases of the officers involved, and overturn the cases that are not proven beyond a reasonable doubt without the inclusion of testimony, statements, affidavits, or involvement, of the named officers.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: *September 14, 2020*

Signature of Plaintiff *Andrew Smigelski*

Printed Name of Plaintiff *Andrew Smigelski*
*1015 Bryan Road*
*Sugar Grove, OH 43155*

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

|  | City | State | Zip Code |
|---|---|---|---|

Telephone Number

E-mail Address

III.

C.

In late August 2018, Plaintiff wrote a letter to the Editor to the Logan Daily News which was published on September 4, 2018.

1. The letter was a direct response to a story in the Logan Daily News about "safety drills" at the schools, which showed the use of Mine resistant vehicles (MRAPS) and humvees.

2. The content of Plaintiff's letter criticized the militarization of the local police, including the use of military tactics and equipment at the schools

3. This criticism has since been echoed by numerous school districts, teacher's unions, and education associations.

4. On September 11, 2018 plaintiff got into a brief oral disagreement with his neighbors Ken James (K. JAMES) and Jessica James (J. JAMES) regarding a noise complaint call that plaintiff had made against K. JAMES earlier in the day.

5. The disagreement came from the dispute that K. JAMES and J. JAMES put up a blue light to show their support of "Law enforcement" even though they refused to obey the laws themselves.

6. The disagreement lasted a few minutes, never elevated to a level that the neighbors across the street could hear, and ended with J. JAMES claiming that Plaintiff "Didn't know who (he) was messing with."

7. J. JAMES further claimed that she had friends and family in the police department who she said would come to Plaintiff's house and "There won't be anyone there to help (him)."

8. Testimony during later proceedings revealed that the "friend on the police force" that J. JAMES referenced was Patrolman Josh Mowery ("MOWERY"). J. JAMES testified that the only officer on the Logan Police Department that she knew as a "friend" was MOWERY.

# MOWERY

9. On the morning of September 12, 2018, approximately 16 hours after the verbal dispute between Plaintiff and K. JAMES and J. JAMES, a police car drove past Plaintiff's house on a deadend street.

10. This was later confirmed by body camera audio to be MOWERY performing a drive-by of the plaintiff's home at 6:50 AM - approximately forty minutes before he arrived at the plaintiff's home to arrest him.

11. At this point in time, Plaintiff thought about what J. JAMES had said the day prior and got his cell phone to go outside and record the officer's vehicle doing the driveby.

12. By the time Plaintiff got outside, MOWERY had already driven away, so plaintiff pointed his phone in video mode toward the house owned by J. and K. JAMES, to make a recorded record of the threat they had issued to Plaintiff the day prior.

13. While Plaintiff was outside dictating to his cell phone regarding the behavior of K. and J. JAMES the day before, and waiting to see if MOWERY'S police cruiser was coming back, K. and J. JAMES came out onto their front porch and began making fun of the plaintiff, including cracking jokes at his expense. This is recorded on cell phone video with audio. And is verified by J. JAMES' later statements to MOWERY.

14. J. JAMES got in her car and left, the Plaintiff presumed for work, and Plaintiff returned to his home to read on his porch.

15. After finishing the chapter, Plaintiff went inside of his home, turned on the TV, and took his dog, Dugin, out the back door to the fenced in backyard.

16. When Plaintiff returned to his living room, there was a police officer with a gun in his hand, and his face pressed against Plaintiff's window. It was MOWERY.

17. Within 30 seconds of being at Plaintiff's home, MOWERY chose to activate the SRT (SWAT) Team. This began a stand off at Plaintiff's home.

18. While Plaintiff had been reading on his porch and watching TV in his home, J. JAMES drove to the police station to meet with her friend MOWERY to try to get the Plaintiff arrested.

19. On MOWERY's body camera video at the police station, he already knows Plaintiff's full name, exact age, and complete address. This indicates a database search has already occurred.

20. Despite this, MOWERY claimed in testimony that he had not performed any database searches on Plaintiff until after talking to J. JAMES.

21. MOWERY was well known for having a problematic and turbulent police career.

22. In 2012, MOWERY threatened a mass shooting at the Home Tavern. CLULEY investigated the incident. For this, MOWERY received a three day suspension.

23. As of an April 20, 2013 performance evaluation WALTON reported that MOWERY "receives more complaints than any other officer here."

24. MOWERY's personnel file shows he had previously expressed his support of nazism, including making a Facebook post in support of Adolf Hitler

25. It was also documented that MOWERY had made fanatical Facebook posts calling Donald Trump's political adversaries "treasonous."

26. MOWERY had previous personal and political interactions with Plaintiff.

27. MOWERY had met Plaintiff four months before the arrest, when Plaintiff was running for office on a campaign of diversity, inclusivity, and civil liberties.

28. Plaintiff was the only individual in the entire county who had run for Statewide (or higher) office in the entirety of 2018.

29. On his arrest report, MOWERY claimed the incident started when his friend, J. JAMES, came to the police station to meet him on the morning of September 12.

30. MOWERY's arrest report starts at 7:07 AM, nine minutes before he arrived at the police station to talk to J. James.

31. MOWERY'S body camera shows him arriving at the police station at 7:16 AM.

32. MOWERY is openly familiar with J. JAMES at the police station. He calls her "Jess."

33. MOWERY has since been revealed to have a long personal history with J. JAMES and K. JAMES.

34. MOWERY attended the police academy with K. James.

35. In testimony, MOWERY claimed to have known K. and J. JAMES for 25 years.

36. Facebook photos and posts show MOWERY socializing with K. JAMES

37. MOWERY's entire family is Facebook friends with the entire JAMES Family.

38. In testimony, MOWERY claimed he had regularly socialized with the JAMES family within the past 3 years.

39. At the scene of the stand-off at Plaintiff's house, prior to arrest, MOWERY told a deputy that he did not know K. or J. JAMES' names saying "I'm not sure of their names, I have it at the office."

40. Regarding Jessica James, MOWERY further tells MORITZ "Jessica is her first name. That's all I can remember." This is captured in video and audio on Plaintiff's cell phone video, and audio only on MOWERY's body camera.

41. In his arrest report, MOWERY claimed the entire statement from J. JAMES was taped.

42. In actuality, MOWERY, turned on his body camera immediately before entering the police station, talked to Jessica James for approximately 9 minutes, then turned off his body camera.

43. MOWERY shut off his body camera less than 30 seconds after Jessica James recalling making fun of Plaintiff.

44. MOWERY kept his body camera off for approximately 10 minutes, then turned it back on.

45. When MOWERY turned his body camera back on, CLULEY was mere feet away, indicating that they had been talking while the body camera was turned off.

46. When MOWERY turned his body camera back on, he was now for the first time talking about a made-up "threat."

47. MOWERY told Jessica James that he was going to Plaintiff's house to make an immediate unwarranted arrest: "I'm going to go to his house and arrest him."

48. MOWERY asked LEVERING to call the jail to make sure there was a bed available

49. LEVERING immediately and willfully complied without question.

50. MOWERY claimed on the arrest report that the arrest was made for a "Crime in Progress" as opposed to a "Complaint"

51. Upon arriving at Plaintiff's home, MOWERY immediately pressed his face against the window glass of Plaintiff's front door, with a gun already in his hand.

52. MOWERY activated the SRT less than 30 seconds after arriving at Plaintiff's home to make the illegal arrest.

53. MOWERY repeatedly refused to identify a reason or probable cause for the arrest.

54. None of the 16 other officers at the scene asked Mowery why or on what grounds he was making the arrest, despite sufficient time to do so.

55. MOWERY lied on his arrest report to say that Plaintiff "was refusing to stand" and that "Andrew refused to put hi [sic] hands behind his back." Multiple angles of video, including MOWERY's own body camera, disprove both of these claims.

56. Plaintiff was physically complying, but repeatedly invoked his fourth amendment rights, saying "I don't consent to a search. I don't consent to any of this."

57. Immediately after Plaintiff said this, MOWERY grabbed plaintiff by the collar, whipped him to his knees, then grabbed the back of Plaintiff's neck and slammed Plaintiff's head into the concrete.

58. This violent attack left Plaintiff severely bruised on the entire left side of his abdomen.

59. After assaulting and battering Plaintiff, MOWERY put on handcuffs so tight that they cut off circulation and bruised both of Plaintiff's wrists.

60. MOWERY then drove the plaintiff to the South East Ohio Regional Jail.

61. MOWERY never read Plaintiff his Miranda rights.

62. Plaintiff invoked his Miranda rights immediately when the police car started moving: "I want to invoke my right to an attorney and my right to remain silent."

63. During the drive, MOWERY can be seen working on fabricating charges by looking up "Inducing Panic" on the Ohio Revised Code website on his cell phone.

64. Plaintiff was not provided an attorney for the arraignment more than 24 hours after the arrest.

65. In total, Plaintiff spent over a full week in jail.

66. Despite immediately requesting an attorney, and again requesting an attorney at the arraignment, and filling out multiple sworn affidavits, Plaintiff was never once provided an attorney.

67. MOWERY lost his job with the City of Logan in May 2020, after pleading guilty to theft in office based offenses because of stealing over $1000+ from the Susan G. Komen foundation in 2017- over a year before illegally arresting Plaintiff.

# CLULEY

68. CLULEY violated Plaintiff's disability and constitutional rights by using the fabricated charge "Weapons Under Disability" on his search warrant as a pretense to violate my privacy.

69. "Weapons Under Disability" does not appear in the arrest report, the indictment, the booking page (on the morning of the arrest), and was not mentioned at the arraignment.

70. CLULEY further lied in his search warrant affidavit to say that "PTL J. MOWERY and PTL E. BURCHFIELD went to 1368 Colorado Ave. Logan Hocking Co. Ohio to speak with Andrew Smigelski."

71. CLULEY talked to MOWERY at the police station before the arrest and knew that MOWERY was coming to Plaintiff's house to arrest him.

72. CLULEY was on body camera video mere feet away from MOWERY in the police station directly before MOWERY drove to Plaintiff's house to make the legally unwarranted arrest.

73. In his search warrant affidavit, CLULEY further claimed: "Upon knocking on the door Andrew Smigelski came to the door opening the door, with a handgun, in his hand."

74. Plaintiff's cellphone and laptop video, as well as multiple body camera videos, disprove this claim. Plaintiff didn't open the door and never had a handgun in his hand.

75. In his affidavit, CLULEY also claimed " Andrew wanted to write a statement and was provided a statement form, in exchange he placed the hand gun [sic] down and walked outside on the porch."

76. Plaintiff never had the handgun in his hand, so he never agreed to place it down. Also, Plaintiff didn't want to write a statement, he was forced to because he was told it was the only possible way to deescalate the situation (17+ armed men outside of his house).

77. CLULEY again lied in his statement to say "Andrew Smigelski wrote his statement and agreed to turn himself in to officers."

78. Plaintiff did write the statement that he was forced to write, but verbally protested the illegal arrest throughout the duration of the interaction. He never "agreed to turn himself in."

79. CLULEY further claimed "Andrew Smigelski was detained and knife [sic] was removed from his person."

80. Plaintiff never had a knife on his person, so no knife was ever "removed from his person."

81. Body camera video shows CLULEY only feet away while multiple officers followed MOWERY's lead and piled on Plaintiff, pulling out his pockets and searching him.

82. Body camera shows CLULEY still mere feet away as officers ask about the Plaintiff: "He got anything on him?"

83. Body camera shows CLULEY observing the other officers explicitly saying that Plaintiff did not have any weapons on him: "Nope."

84. After the arrest, CLULEY can again be seen/heard on body camera standing around with other officers discussing the Letter to the Editor that Plaintiff wrote to the Logan Daily News 9 days prior to the arrest. Nearly every officer at the scene is shown to be already aware of Plaintiff's letter to the Editor.

85. Since the time of Plaintiff's Letter to the Editor, many major Teachers Unions have come out to say that the type of drills Plaintiff criticized are deleterious to the mental wellbeing of students in their district.

86. CLULEY never attempted to identify what source any of the false information in the affidavit was coming from, meaning that it was coming from CLULEY directly.

87. CLULEY used his false claims as a pretense to search PLAINTIFF's house for "Firearms, ammunition, firearm accessories, cell phones, computers, writing pertaining his thought process and any contraband."

88. CLULEY made no attempt to justify any of the above items in his affidavit, nor did he explain why he expected to to find them, nor did he particularly describe the items or why they were to be seized.

89. CLULEY's search yielded no firearms, one single 9MM bullet (with its primer already stuck) sitting on the mirror in Plaintiff's living room, and separately one empty holster sitting on the passenger seat of Plaintiff's vehicle, and one empty 10 round magazine which came factory new with the gun MORITZ confiscated under coercion earlier.

90. CLULEY's search for "writing pertaining (Plaintiff's) thought process yielded over 1000 pages of unpublished stories, notes, outlines, and drafts, as well as personal journals. In addition, CLULEY searched victim's college notes and foreign language notes.

91. As a writer, this is one of the most mentally and psychologically traumatizing events the Plaintiff has to endure.

92. Out of these 1000+ pages, CLULEY selected only 11 pages , out of context, to photograph. He purposefully avoided giving context to anything he photographed, nor did he seize any of the actual notebooks or folders, despite listing all "writing pertaining (Plaintiff's) thought process" as a thing to be seized.

93. CLULEY'S search for "writing pertaining (Plaintiff's) thought process" also resulted in pulling books off from Plaintiff's shelf and copies of checked out library books.

94. Plaintiff had several hundred books in his house at the time of the search warrant, but CLULEY again selectively chose not to photograph the entire collection, instead singling out only a few books and intentionally avoiding photographing any others, to avoid giving context.

95. Photographed books include *Easy Arabic Grammar, the Qur'an,* the libertarian *Economics in One Lesson,* the acclaimed *Devil in the White City,* Truman Capote's *in Cold Blood,* and perhaps most ironically Yevgeny Zamayatin's dystopian novel *We* - widely considered to be the father of all modern dystopian novels (including *1984, Brave New World, and Anthem"*

96. In total, 92 photographs of Plaintiff's home and vehicle were taken - including writing, books, library receipts, mail, "A Vote Libertarian" button, prescriptions, and multiple photos of Plaintiff's vehicle, inside and out, every room of the house, and every drawer, cabinet (except the filing cabinet that contained the writing), refrigerator, freezer, pantry, closet, etc.

97. Conspicuously absent from any of the photos taken inside Plaintiff's home are any photos whatsoever of the "loose marijuana" that CLULEY claimed to find in three different rooms of Plaintiff's home. Additionally, no marijuana was ever admitted into evidence nor are any amounts or measurements given. This is another false claim by CLULEY.

98. In his affidavit, CLULEY requested a "forensic examination of Plaintiff's cell phone" as a thing to be seized - again with no explanation to how this could possibly be related to the charges brought by MOWERY, or what he expected to find, or why he expected to find it.

99. CLULEY fell far short of the protections granted by the Fourth Amendment to the U.S. Constitution, including that he "particularly describe" the things to be seized.

100. The invasion of privacy from the illegal "forensic examination" of Plaintiff's cell phone included CLULEY viewing/copying the entire contents of Plaintiff's cellphone - including internet history, phone history, location history, naked photos, text messages, app data - including for dating apps, cookies, usage data, and more.

101. CLULEY also took the Plaintiff's dog Dugin to the animal shelter - traumatizing the little guy, and further violating Plaintiff.

102. CLULEY repeated many of his lies to the Logan Daily News, libeling PLAINTIFF and giving out Plaintiff's exact name, exact age, and full address for publication - a first time event in CLULEY's entire history of giving comment to the Logan Daily News.

## PROSECUTOR

103. CITY ATTORNEY SAVING, at trial, called the case a waste of time: "I think we've wasted enough of everybody's time with this case."

104. CITY ATTORNEY SAVING failed to provide me an attorney at the arraignment, even though I had specifically requested one over 24 hours in advance.

105. At the arraignment, CITY ATTORNEY SAVING lied to the judge to claim that Plaintiff had a "Hit list with (The Judge's) name on it." When officers served the illegal search warrant on Plaintiff's home.

106. None of the photographs taken in Plaintiff's home show any hit list whatsoever because there never was a hit list.

107. Because of CITY ATTORNEY SAVING telling this lie at the arraignment, the Judge ignored his obligation to review the warrantless arrest for probable cause and said he would recuse himself from the case, after he granted whatever CITY ATTORNEY SAVING asked for in bail.

108. CITY ATTORNEY SAVING requested $150,000 cash bond, which was immediately granted by the judge. This is despite the fact that CITY ATTORNEY SAVING knew that Plaintiff had no criminal record, and was indigent, as he had just declared repeatedly in court.

109. After Plaintiff spent a week in jail, still never having been appointed an attorney, his parents hired one from Columbus to argue on behalf of Plaintiff at a preliminary hearing to try to free Plaintiff from his unlawful imprisonment.

110. At this point, CITY ATTORNEY SAVING used Plaintiff's illegal incarceration as leverage to suggest a recognizance bond, at the price that Plaintiff would have to sign away his right to a speedy trial, and submit to GPS monitoring at the cost of $400/month.

111. GPS monitoring continued for three and a half months, until Plaintiff/attorney could finally have a motion to dismiss/suppress the search warrant. This is despite the fact that Plaintiff, through his attorney, had repeatedly asked CITY ATTORNEY SAVING to have the GPS tracker removed.

112. Immediately prior to the motion hearing on December 11, 2018, CITY ATTORNEY SAVING offered a partial plea deal - she would dismiss the perjured search warrant, if Plaintiff agreed not to question CLULEY at the trial.

113. Plaintiff declined this offer.

114. At the motion hearing on December 11, 2018 when Plaintiff, his attorney, and family arrived at the courthouse, CITY ATTORNEY SAVING said that she didn't have time to review the motion to dismiss/suppress, and needed to reschedule for a week later. She could have called to tell this but intentionally chose not to.

115. CITY ATTORNEY SAVING subpoenaed officers MOWERY, CLULEY, and BURCHFIELD to show up to the motion hearing on both of the two separate days.

116. None of these three officers showed up to either motion hearing date, but Plaintiff was still billed $96 in subpoena fees for the officers to not show up. Despite being directly financially charged for the cost of the officers subpoenas, none of the officers were held in contempt of court. This money was never refunded.

117. At the motion hearing for the search warrant on December 18, 2018, CITY ATTORNEY SAVING immediately capitulated within less than a minute. Indicating that she knew the whole thing was falsified. This preempted the actual motion hearing before the judge could review the evidence and declare CLULEY's lies to be Brady evidence.

118. Upon CITY ATTORNEY SAVING finally agreeing to the dismissal of the search warrant, the judge immediately ordered the GPS tracker removed. This is despite the fact that not a single charge was ever brought subsequent to anything related to the illegal search.

119. In total the GPS tracking cost Plaintiff over $1000, as well as extreme discomfort, embarrassment, humiliation, anxiety, and physical pain from frequent leg spasms and cramps from the GPS tracker being too tight, despite his requests that it be loosened slightly.

120. CITY ATTORNEY SAVING is married to JUDGE SAVING who signed off on the illegal search warrant.

121. Despite Plaintiff immediately invoking Miranda rights at the time of the arrest, he had still not been appointed an attorney at the arraignment nearly 24 hours later.

122. CITY ATTORNEY SAVING issued subpoenas for CLULEY, MOWERY, AND BURCHFIELD for the March 8th and 18th trial dates.

123. MOWERY AND BURCHFIELD showed up to these trial dates. But CLULEY never once made an appearance at the court for any of the four different days that CITY ATTORNEY SAVING subpoenaed him to show up. Despite this, Plaintiff was billed the full cost of each subpoena for CLULEY to not show up to court. CLULEY was not held in contempt at the trail dates either.

124. During the Pre-trial phases, CITY ATTORNEY SAVING refused to comply with discovery, including failing to provide a single full point of evidence from a list of 15 points requested by the Plaintiff over four full months before the trial.

125. During the trial, CITY ATTORNEY SAVING repeatedly referenced evidence that was either never turned over to Plaintiff (as it should have been), or which never existed at all.

126. During the trial, CITY ATTORNEY SAVING claimed in opening statements that "perhaps (the officers) were just there to talk to (Plaintiff)." This is despite the fact that CITY ATTORNEY SAVING had already seen the video of MOWERY premeditating the arrest at the police station.

127. During the trial, CITY ATTORNEY SAVING charged Plaintiff with Aggravated Menacing, Obstructing Official Business, and Resisting Arrest.

128. CITY ATTORNEY SAVING had direct evidence to contradict at minimum two of these charges.

129. CITY ATTORNEY SAVING lied again in her closing statements at trial - falsely claiming "Both Mr. and Mrs. James said that conversation ended with Mr. Smigelski pointing his finger at them."
This is another deliberate lie, contradicted by the testimony of Mr. and Mrs. James.

130.   Subsequent to the trial, CITY ATTORNEY SAVING unethically conferred with Attorney Timothy Gleeson by going out of her way to provide him directly with key information/evidence so he could gain an unfair advantage for any potential subsequent civil actions.

131.   During the course of the appeal, CITY ATTORNEY SAVING lied in her appellate brief to claim that all of the 24 total points of evidence requested by time of the trial "Simply did not exist."

132.   CITY ATTORNEY SAVING further falsely claimed that the Plaintiff's requested list of evidence "Would not result in additional evidence being produced."

133.   A public records request submitted to the city proves this is a lie. The records request shows that MOWERY had a history of targeting, harassing, and arresting people on behalf of his friends and family, and had made neo-nazi posts publicly on his Facebook page in support of Adolf Hitler.

134.   CITY ATTORNEY SAVING knew about this exculpatory potential Brady evidence, but lied about it and covered it up to cheat her way into winning a conviction.

135.   CITY ATTORNEY SAVING also knew about MOWERY's incident at Home Tavern - that he had threatened a mass shooting, as well as singling out individuals and telling them that he would "gut them" and "slit (their) throats"

# MORITZ

136. MORITZ Repeatedly told Plaintiff that he was going to enter his house, even though Plaintiff continuously denied consent multiple times.

137. MORITZ picked up pill bottle and asked (QUOTE#1) showing that he was aware of Plaintiff's disability status, as well as his specific disability.

138. Plaintiff's disability status under the ADA is well established among other government institutions.

139. MORITZ repeatedly assured Plaintiff that he was not under arrest. nor would he be physically attacked.

140. MORTIZ had the Plaintiff fill out a "Voluntary Statement" form that starts as follows:

"Voluntary Statement
(Not Under Arrest)

'I **Andrew Smigelski** on this **12** day of **September** 20**18**, am not under arrest for nor am I being detained for any criminal offenses concerning the events I am about to make known to the Sheriff's Interdiction Unit. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purpose it may serve.'"

141. The SHERIFF'S DEPARTMENT through this document and MORITZ repeatedly lied to Plaintiff, telling Plaintiff that he was not under arrest, when they knew and should have known that was not true.

142. Immediately after Plaintiff finished his statement, MORITZ again affirmatively told Plaintiff that he was going inside of Plaintiff's home to take Plaintiff's personal defense firearm.

143. Plaintiff again declined consent for MORITZ to enter his home.

144. MORITZ then handed Plaintiff over to MOWERY, despite the fact that MOWERY refused to identify any reason or probable cause to legally affect the arrest.

145. When MOWERY started to arrest Plaintiff, Plaintiff still had his cell phone in his hand. MORITZ, anticipating violence, told Plaintiff "Let me take your phone so it doesn't get broke."

146. Plaintiff declined to hand the phone to MORITZ despite MORITZ's repeated demands. Because of Plaintiff's right to be free of unreasonable searches, and did not want to give consent to search the phone or its contents.

147. MORITZ had reason to believe that MOWERY was about to use excessive force to illegally seize the cell phone, because less than 5 seconds after MORITZ handed Plaintiff over to MOWERY, MOWERY slammed plaintiff to the ground anyway and took the phone.

148. MORITZ tried to blame Plaintiff for the use of excessive force, although body camera videos and MORITZ's own observations disprove the claim.

149. After Plaintiff was put in the back of MOWERY's police car, MORITZ walked over to the other officers, and began talking about the Letter to the Editor that Plaintiff had written 9 days prior. The same letter that MORITZ had just repeatedly denied knowing anything about. He then encouraged the Logan Police Department to conduct an illegal search of Plaintiff's home. CLULEY was present with MORITZ at the time of this conversation.

# SKINNER

150.   SKINNER, while hiding on the side of the Plaintiff's house, threatened to stab Plaintiff's dog on the porch: "I'm going to stab this dog." As SKINNER said this, he removed a weapon from his person.

151.   SKINNER encouraged other officers to use excessive force against Plaintiff by saying:

"He's gonna get tasered. Crack him. Crack him. Crack him. Crack him. Crack him. Crack him with the taser. Shoot him. Just go ahead and hit him. Go ahead and hit him. Go ahead and hit him. Go ahead and hit him."

152.   SKINNER again promoted excessive force against Plaintiff by encouraging another officer to "start dumping him with shotgun rounds and the less than lethal."

153.   At the same time, SKINNER expressed his own excited anticipation at the prospect of using excessive force: " I'm gonna run up and tase him." SKINNER can be seen on body camera video numerous times, priming his taser in anticipation of firing it.

154.   Immediately after Plaintiff was victimized by MOWERY's excessive force, SKINNER ran around to the other side of the porch and piled onto the Plaintiff.

155.   SKINNER then punched the taser in his hand repeatedly into the Plaintiff's spine, directly over Plaintiff's heart.

156.   SKINNER inflicted pain in a violent, angry, and aggressive manor.

157.   When Plaintiff declined to have MORITZ grab his bottle of prescription pills while MORITZ was coercively retrieving Plaintiff's handgun, SKINNER made the anti-disability comment "I think that's part of the problem."

158.    SKINNER further made fun of Plaintiff based on his disability status as
Plaintiff counted the 17 officers outside his house while MOWERY walked him to
the police vehicle by saying: "Wow he can count."

# GABRIEL

159.    GABRIEL suborned CLULEY to commit perjury on the search warrant by
telling him "Get a warrant on that." This is despite the fact that no crime had been
committed, and there was no probable cause or reason for the officers to enter
Plaintiff's home.

160.    GABRIEL also talked about getting a warrant to search Plaintiff's car,
residence, writing, and belongings with SKINNER.

161.    GABRIEL seems unphased by the lack of any genuine grounds to conduct a
search of Plaintiff's home and property. Instead he just says "Have CLULEY write
one up real quick.

162.    Plaintiff's Fourth Amendment rights in the United States Constitution prohibit
police from violating a person, their papers, or their property, just because the
officers feel like doing so.

163.    A search warrant must be supported by oath or affirmation, but oaths mean
nothing when they have been almost completely perjured.

164.    After MOWERY had slammed Plaintiff to the ground, GABRIEL was one of
several officers who pushed their way through to brutally restrain Plaintiff.
Despite the intense pain, terror, anguish, and anxiety this situation caused the

Plaintiff, GABRIEL seems to have gotten satisfaction from it because he can be seen on body camera saying "That was fun."

# JONAH SAVING

165. Signed off on search warrant affidavit from CLULEY that was almost entirely perjured.

166. JUDGE SAVING failed to question the obviously deficient search warrant. He didn't ask where the information was coming from, why CLULEY needed to enter Plaintiff's house, how any of the listed "evidence to be seized" correlated with any of the charges that were being alleged, or why CLULEY expected to find them.

167. JUDGE SAVING also signed off on a search warrant for a case that he knew, or should have known his wife would be prosecuting.

168. There were at least four other available judges and magistrates in Hocking County that day, any of which could have signed off on it if it were actually valid and accurate.

# SEORJ

169. Upon arrival at the South East Ohio Regional Jail, Plaintiff was put into a holding cell barefoot and wearing only his pajamas.

170. Plaintiff was then stripped naked and searched in front of the guards, furthering the invasion of privacy to even more extreme levels.

171. The SEORJ through its employees also illegally collected Plaintiff's DNA, in contradiction to state law.

172. Ohio Law says that anyone arrested for a felony must have their DNA collected for the database. However, a screenshot of the booking page the morning of the arrest shows Plaintiff was not even claimed to be accused of a felony.

173. Nor do any felony charges appear in the arrest report, indictment, or at the arraignment.

174. This illegal DNA collection is violating in core and fundamental human ways. This invasion of privacy not only affects Plaintiff, but also his blood relatives and progeny.

## CITY OF LOGAN

175. WALTON knew that Mowery had more complaints than any officer on the force, as early as 2013, but failed to appropriately address the issue.

176. CLULEY, WALTON, MELLINGER, GABRIEL, and SKINNER, as well as CITY ATTORNEY SAVING, AND FRAUNFELTER, knew that MOWERY was a neo-nazi who had publicly posted his support fascism, nazism, and Adolf Hitler.

177. The above named officers failed to intervene with MOWERY, an officer whose fascist beliefs are antithetical to the values of this country and the Constitution they swore to uphold.

178. By allowing a known white supremacist to remain on their police force was negligent at an absolute minimum. They knew or should have known that his biases precluded him from being able to appropriately carry out his functions as a police officer under color of law.

179. Not only did the CITY OF LOGAN not fire MOWERY after he publicly posted his white supremacist belliefs, they didn't suspend, cite, reprimand, or even orally worn him against such beahvior.

180. This extreme negligence created a culture of permissiveness and allowed MOWERY to continue to abuse his powers.

181. The same above named individuals and CITY OF LOGAN employees knew that MOWERY had threatened a mass shooting and other acts of violence against individuals and the establishment at large at Home Tavern.

182. Despite being aware of this behavior the only punishment MOWERY received was a 3 day suspension.

183. The CITY OF LOGAN's policies and procedures should prevented these violations.

184. In the alternative, CITY of LOGAN's policies and procedures are the direct and proximate cause of these violations.

185. The CITY OF LOGAN, through its employees, including the LOGAN POLICE, LEVERING, and CITY ATTORNEY SAVING, violated Plaintiff's civil and constitutional rights.

## MELLINGER

186. MELLINGER failed to intervene as MOWERY made a false, personally and politically motivated arrest. Despite  being at the scene, MELLINGER never once asked MOWERY why he was there, or what probable cause justification he had to affect the warrantless arrest.

187.  MELLINGER also failed to intervene by not stopping CLULEY from writing a perjured search warrant to invade Plaintiff's home and privacy. MELLINGER and CLULEY had plenty of time to get the fact straight, but chose not to, because the facts wouldn't have justified the search.

188.  Additionally, after the trial, MELLINGER violated Ohio Public Records Law by repeatedly and illegally withholding evidence that the Police department was obligated to produce to the plaintiff.

# FBI/DOJ

189.  Have worked with CLULEY in a professional context in the past

190.  Have paid CLULEY, directly or indirectly, for services performed for the FBI

191.  CLULEY was actively receiving payment from the FBI at the time of the illegal search

192.  FBI/DOJ received stolen, misleading, out of context, or illegally obtained information/evidence from CLULEY as a direct result of the illegal search.

193.  FBI/DOJ used CLULEY's ill gotten and misrepresented information/evidence as a pretense to launch an intensive investigation into Plaintiff.

194.  FBI/DOJ was actively surveilling plaintiff while also actively working with the prosecuting municipality - The CIty of Logan

195.  The agents/agencies knew or should have known that the information/evidence was invalid, unlawfully, and unconstitutionally obtained.

196. Agents at the Athens FBI continued to use CLULEY's perjured search as justification to maintain an investigation until after the motion hearing to dismiss/suppress search warrant.

197. Immediately after the search warrant was dismissed at the motion hearing, An FBI Agent(s) called Plaintiff's attorney in December 2018 and said that he had received information/evidence from the Logan Police Department.

198. FBI and DOJ databases directly benefited from the situation by receiving Plaintiff's unlawfully collected fingerprints and DNA.

199. FBI repeatedly refused to comply with a FOIPA request that would have provided additional insights into the situation.

IV. Injuries

Physically I was subjected to the worst bodily damage that I have ever experienced in my entire life. This was at the hands of Neo-Nazi Josh Mowery. I had bruising down the entire side of my body after he aggravated assaulted me as I invoked my fourth amendment rights. Video proves this. I was not able to properly document these injuries because I was illegally incarcerated for an entire week after the assault and battery, without access to an attorney or a camera.

Additionally, nearly two years after the incident, I continue to have night terrors almost every night as a direct result of the actions of the officers. I have frequent nightmares about being attacked by the police, violated, arrested, and shipped off into train cars to concentration camps. I am embarrassed to admit that these awful dreams can ruin my entire next day, can destroy streaks of progress, and can negatively affect and control my life. I am not in control of these nightmares stemming from the violations perpetrated by these various law enforcement officers and it makes it difficult to live a happy, normal, productive life.

Further, the injuries subsequent to the illegal search are also extremely psychologically damaging. I feel violated in the most core and fundamental ways possible. I am (or was) a creative writer for fiction, non-fiction, and freelance. Since having the police illegally violate every page of my writing, I can barely look at it without feeling nauseated, sick, frustrated, and angry. I believe this was the point. To prevent me from being able to seriously pursue my career and source of income. Just nine days prior to this illegal search of my writing, I had written a Letter to the Editor in the local newspaper (Logan Daily News) criticizing the militarization and heavy-handed terror tactics of the local rural Ohio police. The police were later caught on body camera video criticizing this letter, laughing about it, and celebrating the fact that they got to arrest me for it.

Additionally, I feel constantly violated knowing that Officer Cluley has stolen naked photos and dating apps from my cell phone. In addition to Romance/erotica themed rough-draft Amazon Kindle eBook writing. Officer Cluley did this with the sanction of law director, Abigail Saving, and her husband Judge Jonah Saving. Because I am an LGBT individual (one of the first to run for office in the entire state just ~3 months before this whole situation), I believe that this crime, and the conspiracies parasitic to it, were done with the intent of committing a bias-motivated hate crime.