**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FILED
RICHARD W. NAGEL
CLERK OF COURT

2021 MAY -7 AM 11: 47

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

ANDREW SMIGELSKI,

        Plaintiff

V.

GREGG CLULEY,
JOSH MOWERY
BEN SKINNER
RYAN GABRIEL
SEORJ GUARD "BROOKS"
        Defendants

Civil Action 2:20-cv-4812
Judge Sarah D. Morrison
Magistrate Judge Jolson

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT

---

### I. PARTIES TO THE COMPLAINT

#### A. PLAINTIFF

Andrew Smigelski
1015 Bryan Road
Sugar Grove, Ohio 43155
Fairfield County
614-607-1230

#### B. DEFENDANTS

1. Gregg Cluley
   773 Wyandotte Ave.
   Logan, Oh 43138

   *In his individual capacity*

2. Josh Mowery

1167 4th St.
Logan, Oh 43138

*In his individual capacity*

3.     Ryan Gabriel
       36242 Geiger Rd.
       Logan, Oh 43138

       *In his individual capacity*

4.     Ben Skinner
       2021 Nature Way
       Lancaster, OH 43130

       *In his individual capacity*

5.     Southeast Ohio Regional Jail Guard "Brooks"
       16677 Riverside Drive
       Nelsonville, OH. 45764

       *In her individual capacity*

## II. Basis for Jurisdiction

A.  42 U.S.C. § 1983 Claim against State/local officials

B.  Fourth Amendment violation against Defendant Cluley for invasion of privacy related to an illegal search from a perjured search warrant

    Fourth Amendment violation against Defendants Mowery, Gabriel, and Skinner for excessive force

    Fourth Amendment violation against Defendant Brooks for illegal DNA collection

D.  Every named defendant committed the civil/constitutional rights violations while working within the official context of their employment in the local, state, and federal agencies. These violations were committed while the government employees were directly drawing a financial hourly/salary benefit from the public institution of their employment.

## III. Statement of Claim

A. Events occurred at my home at 1368 Colorado Avenue in the city of Logan, Hocking County, Ohio

B. Events occurred on September 12, 2018

C. Facts in support of the claim are attached

IV. Injuries

Facts related to injuries are attached

V. Claim for relief is attached

VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11

A. I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case

Date of Signing - May 4, 2021

Signature of Plaintiff        /s/ Andrew Smigelski

Printed Name of Plaintiff        Andrew Smigelski

III.

## C. Facts of Claim

In late August 2018, Plaintiff wrote a letter to the Editor to the Logan Daily News which was published on September 4, 2018.

1. The letter was a direct response to a story in the Logan Daily News about "safety drills" at the schools, which showed the use of Mine resistant vehicles (MRAPS) and humvees.

2. The content of Plaintiff's letter criticized the militarization of the local police, including the use of military tactics and equipment at the schools

3. This criticism has since been echoed by numerous school districts, teacher's unions, and education associations.

4. On September 11, 2018 plaintiff got into a brief oral disagreement with his neighbors Ken James (K. JAMES) and Jessica James (J. JAMES) regarding a noise complaint call that plaintiff had made against K. JAMES earlier in the day.

5. The disagreement came from the dispute that K. JAMES and J. JAMES put up a blue light to show their support of "Law enforcement" even though they refused to obey the laws themselves.

6. The disagreement lasted a few minutes, never elevated to a level that the neighbors across the street could hear, and ended with J. JAMES claiming that Plaintiff "Didn't know who (he) was messing with."

7. J. JAMES further claimed that she had friends and family in the police department who she said would come to Plaintiff's house and "There won't be anyone there to help (him)."

8. Testimony during later proceedings revealed that the "friend on the police force" that J. JAMES referenced was Patrolman Josh Mowery ("MOWERY"). J. JAMES testified that the only officer on the Logan Police Department that she knew as a "friend" was MOWERY.

# MOWERY

9. On the morning of September 12, 2018, approximately 16 hours after the verbal dispute between Plaintiff and K. JAMES and J. JAMES, a police car drove past Plaintiff's house on a deadend street.

10. This was later confirmed by body camera audio to be MOWERY performing a drive-by of the plaintiff's home at 6:50 AM - approximately forty minutes before he arrived at the plaintiff's home to arrest him.

11. At this point in time, Plaintiff thought about what J. JAMES had said the day prior and got his cell phone to go outside and record the officer's vehicle doing the driveby.

12. By the time Plaintiff got outside, MOWERY had already driven away, so plaintiff pointed his phone in video mode toward the house owned by J. and K. JAMES, to make a recorded record of the threat they had issued to Plaintiff the day prior.

13. While Plaintiff was outside dictating to his cell phone regarding the behavior of K. and J. JAMES the day before, and waiting to see if MOWERY'S police cruiser was coming back, K. and J. JAMES came out onto their front porch and began making fun of the plaintiff, including cracking jokes at his expense. This is recorded on cell phone video with audio. And is verified by J. JAMES' later statements to MOWERY.

14. J. JAMES got in her car and left, the Plaintiff presumed for work, and Plaintiff returned to his home to read on his porch.

15. After finishing the chapter, Plaintiff went inside of his home, turned on the TV, and took his dog, Dugin, out the back door to the fenced in backyard.

16. When Plaintiff returned to his living room, there was a police officer with a gun in his hand, and his face pressed against Plaintiff's window. It was MOWERY.

17. Within 30 seconds of being at Plaintiff's home, MOWERY chose to activate the SRT (SWAT) Team. This began a stand off at Plaintiff's home.

18. MOWERY had previous personal and political interactions with Plaintiff.

19. MOWERY had met Plaintiff four months before the arrest, when Plaintiff was running for office on a campaign of diversity, inclusivity, and civil liberties.

20. Plaintiff was the only individual in the entire county who had run for Statewide (or higher) office in the entirety of 2018.

21. MOWERY is openly familiar with J. JAMES at the police station. He calls her "Jess."

22. MOWERY has since been revealed to have a long personal history with J. JAMES and K. JAMES.

23. MOWERY attended the police academy with K. James.

24. In testimony, MOWERY claimed to have known K. and J. JAMES for 25 years.

25. Facebook photos and posts show MOWERY socializing with K. JAMES

26. MOWERY's entire family is Facebook friends with the entire JAMES Family.

27. In testimony, MOWERY claimed he had regularly socialized with the JAMES family within the past 3 years.

28. At the scene of the stand-off at Plaintiff's house, prior to arrest, MOWERY told a deputy that he did not know K. or J. JAMES' names saying "I'm not sure of their names, I have it at the office."

29. Regarding Jessica James, MOWERY further tells MORITZ "Jessica is her first name. That's all I can remember." This is captured in video and audio on Plaintiff's cell phone video, and audio only on MOWERY's body camera.

30. MOWERY shut off his body camera less than 30 seconds after Jessica James recalling making fun of Plaintiff.

31. MOWERY kept his body camera off for approximately 10 minutes, then turned it back on.

32. When MOWERY turned his body camera back on, CLULEY was mere feet away, indicating that they had been talking while the body camera was turned off.

33. Upon arriving at Plaintiff's home, MOWERY immediately pressed his face against the window glass of Plaintiff's front door, with a gun already in his hand.

34. MOWERY activated the SRT less than 30 seconds after arriving at Plaintiff's home

35. Plaintiff was physically complying, but repeatedly invoked his fourth amendment rights, saying "I don't consent to a search. I don't consent to any of this."

36. Immediately after Plaintiff said this, MOWERY grabbed plaintiff by the collar, whipped him to his knees, then grabbed the back of Plaintiff's neck and slammed Plaintiff's head into the concrete.

37. This violent attack left Plaintiff severely bruised on the entire left side of his abdomen.

38. After assaulting and battering Plaintiff, MOWERY put on handcuffs so tight that they cut off circulation and bruised both of Plaintiff's wrists.

39. MOWERY then drove the plaintiff to the South East Ohio Regional Jail.

40. MOWERY lost his job with the City of Logan in May 2020, after pleading guilty to theft in office based offenses because of stealing over $1000+ from the Susan G. Komen foundation in 2017- over a year before illegally arresting Plaintiff.

## CLULEY

41. CLULEY violated Plaintiff's disability and constitutional rights by using the fabricated charge "Weapons Under Disability" on his search warrant as a pretense to violate my privacy.

42. "Weapons Under Disability" does not appear in the arrest report, the indictment, the booking page (on the morning of the arrest), and was not mentioned at the arraignment.

43. CLULEY further lied in his search warrant affidavit to say that "PTL J. MOWERY and PTL E. BURCHFIELD went to 1368 Colorado Ave. Logan Hocking Co. Ohio to speak with Andrew Smigelski."

44. In his search warrant affidavit, CLULEY further claimed: "Upon knocking on the door Andrew Smigelski came to the door opening the door, with a handgun, in his hand."

45. Plaintiff's cellphone and laptop video, as well as multiple body camera videos, disprove this claim. Plaintiff didn't open the door and never had a handgun in his hand.

46. In his affidavit, CLULEY also claimed " Andrew wanted to write a statement and was provided a statement form, in exchange he placed the hand gun [sic] down and walked outside on the porch."

47. Plaintiff never had the handgun in his hand, so he never agreed to place it down. Also, Plaintiff didn't want to write a statement, he was forced to because he was told it was the only possible way to deescalate the situation (17+ armed men outside of his house).

48. CLULEY again lied in his statement to say "Andrew Smigelski wrote his statement and agreed to turn himself in to officers."

49. Plaintiff did write the statement that he was forced to write, but verbally protested the illegal arrest throughout the duration of the interaction. He never "agreed to turn himself in."

50. CLULEY further claimed "Andrew Smigelski was detained and knife [sic] was removed from his person."

51. Plaintiff never had a knife on his person, so no knife was ever "removed from his person."

52. Body camera video shows CLULEY only feet away while multiple officers followed MOWERY's lead and piled on Plaintiff, pulling out his pockets and searching him.

53. Body camera shows CLULEY still mere feet away as officers ask about the Plaintiff: "He got anything on him?"

54. Body camera shows CLULEY observing the other officers explicitly saying that Plaintiff did not have any weapons on him: "Nope."

55. After the arrest, CLULEY can again be seen/heard on body camera standing around with other officers discussing the Letter to the Editor that Plaintiff wrote to the Logan Daily News 9 days prior to the arrest. Nearly every officer at the scene is shown to be already aware of Plaintiff's letter to the Editor.

56. Since the time of Plaintiff's Letter to the Editor, many major Teachers Unions have come out to say that the type of drills Plaintiff criticized are deleterious to the mental wellbeing of students in their district.

57. CLULEY never attempted to identify what source any of the false information in the affidavit was coming from, meaning that it was coming from CLULEY directly.

58. CLULEY used his false claims as a pretense to search PLAINTIFF's house for "Firearms, ammunition, firearm accessories, cell phones, computers, writing pertaining his thought process and any contraband."

59. CLUEY made no attempt to justify any of the above items in his affidavit, nor did he explain why he expected to find them, nor did he particularly describe the items or why they were to be seized.

60. CLULEY's search yielded no firearms, one single 9MM bullet (with its primer already stuck) sitting on the mirror in Plaintiff's living room, and separately one empty holster sitting on the passenger seat of Plaintiff's vehicle, and one empty 10 round magazine which came factory new with the gun MORITZ confiscated under coercion earlier.

61. CLULEY's search for "writing pertaining (Plaintiff's) thought process yielded over 1000 pages of unpublished stories, notes, outlines, and drafts, as well as personal journals. In addition, CLULEY searched victim's college notes and foreign language notes.

62. As a writer, this is one of the most mentally and psychologically traumatizing events the Plaintiff has to endure.

63. Out of these 1000+ pages, CLULEY selected only 11 pages , out of context, to photograph. He purposefully avoided giving context to anything he photographed, nor did he seize any of the actual notebooks or folders, despite listing all "writing pertaining (Plaintiff's) thought process" as a thing to be seized.

64. CLULEY'S search for "writing pertaining (Plaintiff's) thought process" also resulted in pulling books off from Plaintiff's shelf and copies of checked out library books.

65. Plaintiff had several hundred books in his house at the time of the search warrant, but CLULEY again selectively chose not to photograph the entire collection, instead singling out only a few books and intentionally avoiding photographing any others, to avoid giving context.

66. Photographed books include *Easy Arabic Grammar, the Qur'an,* the libertarian *Economics in One Lesson,* the acclaimed *Devil in the White City,* Truman Capote's *in Cold Blood,* and perhaps most ironically Yevgeny Zamayatin's dystopian novel *We* - widely considered to be the father of all modern dystopian novels (including *1984, Brave New World, and Anthem)*

67. In total, 92 photographs of Plaintiff's home and vehicle were taken - including writing, books, library receipts, mail, "A Vote Libertarian" button, prescriptions, and multiple photos of Plaintiff's vehicle, inside and out, every room of the house, and every drawer, cabinet (except the filing cabinet that contained the writing), refrigerator, freezer, pantry, closet, etc.

68. Conspicuously absent from any of the photos taken inside Plaintiff's home are any photos whatsoever of the "loose marijuana" that CLULEY claimed to find in three different rooms of Plaintiff's home. Additionally, no marijuana was ever admitted into evidence nor are any amounts or measurements given. This is another false claim by CLULEY.

69. In his affidavit, CLULEY requested a "forensic examination of Plaintiff's cell phone" as a thing to be seized - again with no explanation to how this could possibly be related to the charges brought by MOWERY, or what he expected to find, or why he expected to find it.

70. CLULEY fell far short of the protections granted by the Fourth Amendment to the U.S. Constitution, including that he "particularly describe" the things to be seized.

71. The invasion of privacy from the illegal "forensic examination" of Plaintiff's cell phone included CLULEY viewing/copying the entire contents of Plaintiff's cellphone - including internet history, phone history, location history, naked photos, text messages, app data - including for dating apps, cookies, usage data, and more.

72. CLULEY also took the Plaintiff's dog Dugin to the animal shelter - traumatizing the little guy, and further violating Plaintiff.

73. CLULEY repeated many of his lies to the Logan Daily News, libeling PLAINTIFF and giving out Plaintiff's exact name, exact age, and full address for publication - a first time event in CLULEY's entire history of giving comment to the Logan Daily News.

74. When MOWERY started to arrest Plaintiff, Plaintiff still had his cell phone in his hand. MORITZ, anticipating violence, told Plaintiff "Let me take your phone so it doesn't get broke."

75. Plaintiff declined to hand the phone to MORITZ despite MORITZ's repeated demands. Because of Plaintiff's right to be free of unreasonable searches, and did not want to give consent to search the phone or its contents.

76. MORITZ had reason to believe that MOWERY was about to use excessive force to illegally seize the cell phone, because less than 5 seconds after MORITZ handed Plaintiff over to MOWERY, MOWERY slammed plaintiff to the ground anyway and took the phone.

77. MORITZ tried to blame Plaintiff for the use of excessive force, although body camera videos and MORITZ's own observations disprove the claim.

78. After Plaintiff was put in the back of MOWERY's police car, MORITZ walked over to the other officers, and began talking about the Letter to the Editor that Plaintiff had written 9 days prior. The same letter that MORITZ had just repeatedly denied knowing anything about. He then encouraged the Logan Police Department to conduct an illegal search of Plaintiff's home. CLULEY was present with MORITZ at the time of this conversation.

# SKINNER

79. SKINNER, while hiding on the side of the Plaintiff's house, threatened to stab Plaintiff's dog on the porch: "I'm going to stab this dog." As SKINNER said this, he removed a weapon from his person.

80. SKINNER encouraged other officers to use excessive force against Plaintiff by saying:

"He's gonna get tasered. Crack him. Crack him. Crack him. Crack him. Crack him. Crack him with the taser. Shoot him. Just go ahead and hit him. Go ahead and hit him. Go ahead and hit him. Go ahead and hit him."

81. SKINNER again promoted excessive force against Plaintiff by encouraging another officer to "start dumping him with shotgun rounds and the less than lethal."

82. At the same time, SKINNER expressed his own excited anticipation at the prospect of using excessive force: " I'm gonna run up and tase him." SKINNER can be seen on body camera video numerous times, priming his taser in anticipation of firing it.

83. Immediately after Plaintiff was victimized by MOWERY's excessive force, SKINNER ran around to the other side of the porch and piled onto the Plaintiff.

84. SKINNER then punched the taser in his hand repeatedly into the Plaintiff's spine, directly over Plaintiff's heart.

85. SKINNER inflicted pain in a violent, angry, and aggressive manor,

86. When Plaintiff declined to have MORITZ grab his bottle of prescription pills while MORITZ was coercively retrieving Plaintiff's handgun, SKINNER made the anti-disability comment "I think that's part of the problem."

87. SKINNER further made fun of Plaintiff based on his disability status as Plaintiff counted the 17 officers outside his house while MOWERY walked him to the police vehicle by saying: "Wow he can count."

## GABRIEL

88. GABRIEL suborned CLULEY to commit perjury on the search warrant by telling him "Get a warrant on that." This is despite the fact that no crime had been committed, and there was no probable cause or reason for the officers to enter Plaintiff's home.

89. GABRIEL also talked about getting a warrant to search Plaintiff's car, residence, writing, and belongings with SKINNER.

90. GABRIEL seems unphased by the lack of any genuine grounds to conduct a search of Plaintiff's home and property. Instead he just says "Have CLULEY write one up real quick.

91. Plaintiff's Fourth Amendment rights in the United States Constitution prohibit police from violating a person, their papers, or their property, just because the officers feel like doing so.

92. A search warrant must be supported by oath or affirmation, but oaths mean nothing when they have been almost completely perjured.

93. After MOWERY had slammed Plaintiff to the ground, GABRIEL was one of several officers who pushed their way through to brutally restrain Plaintiff. Despite the intense pain, terror, anguish, and anxiety this situation caused the Plaintiff, GABRIEL seems to have gotten satisfaction from it because he can be seen on body camera saying "That was fun."

## JONAH SAVING

94. Signed off on search warrant affidavit from CLULEY that was almost entirely perjured.

95. JUDGE SAVING failed to question the obviously deficient search warrant. He didn't ask where the information was coming from, why CLULEY needed to enter Plaintiff's house, how any of the listed "evidence to be seized" correlated with any of the charges that were being alleged, or why CLULEY expected to find them.

96. JUDGE SAVING also signed off on a search warrant for a case that he knew, or should have known his wife would be prosecuting.

97. There were at least four other available judges and magistrates in Hocking County that day, any of which could have signed off on it if it were actually valid and accurate.

## SEORJ

98. Upon arrival at the South East Ohio Regional Jail, Plaintiff was put into a holding cell barefoot and wearing only his pajamas.

99. Plaintiff was then stripped naked and searched in front of the guards, furthering the invasion of privacy to even more extreme levels.

100. The SEORJ through its employees also illegally collected Plaintiff's DNA, in contradiction to state law.

101. Ohio Law says that anyone arrested for a felony must have their DNA collected for the database. However, a screenshot of the booking page the morning of the arrest shows Plaintiff was not even claimed to be accused of a felony.

102. Nor do any felony charges appear in the arrest report, indictment, or at the arraignment.

103.    This illegal DNA collection is violating in core and fundamental human ways. This invasion of privacy not only affects Plaintiff, but also his blood relatives and progeny.

104.    MELLINGER also failed to intervene by not stopping CLULEY from writing a perjured search warrant to invade Plaintiff's home and privacy. MELLINGER and CLULEY had plenty of time to get the fact straight, but chose not to, because the facts wouldn't have justified the search.

## FBI/DOJ

105.    Have worked with CLULEY in a professional context in the past

106.    Have paid CLULEY, directly or indirectly, for services performed for the FBI

107.    CLULEY was actively receiving payment from the FBI at the time of the illegal search

108.    FBI/DOJ received stolen, misleading, out of context, or illegally obtained information/evidence from CLULEY as a direct result of the illegal search.

109.    FBI/DOJ used CLULEY's ill gotten and misrepresented information/evidence as a pretense to launch an intensive investigation into Plaintiff.

110.    FBI/DOJ was actively surveilling plaintiff while also actively working with the prosecuting municipality - The CIty of Logan

111.    The agents/agencies knew or should have known that the information/evidence was invalid, unlawfully, and unconstitutionally obtained.

112.    Agents at the Athens FBI continued to use CLULEY's perjured search as justification to maintain an investigation until after the motion hearing to dismiss/suppress search warrant.

113.    Immediately after the search warrant was dismissed at the motion hearing, An FBI Agent(s) called Plaintiff's attorney in December 2018 and said that he had received information/evidence from the Logan Police Department.

114.    FBI and DOJ databases directly benefited from the situation by receiving Plaintiff's unlawfully collected fingerprints and DNA.

115.    FBI repeatedly refused to comply with a FOIPA request that would have provided additional insights into the situation.

# IV. Injuries

Physically I was subjected to the worst bodily damage that I have ever experienced in my entire life. This was at the hands of Neo-Nazi Josh Mowery. I had bruising down the entire side of my body after he aggravated assaulted me as I invoked my fourth amendment rights. Video proves this. I was not able to properly document these injuries because I was illegally incarcerated for an entire week after the assault and battery, without access to an attorney or a camera.

Additionally, nearly two years after the incident, I continue to have night terrors almost every night as a direct result of the actions of the officers. I have frequent nightmares about being attacked by the police, violated, arrested, and shipped off into train cars to concentration camps. I am embarrassed to admit that these awful dreams can ruin my entire next day, can destroy streaks of progress, and can negatively affect and control my life. I am not in control of these nightmares stemming from the violations perpetrated by these various law enforcement officers, and it makes it difficult to live a happy, normal, productive life.

Further, the injuries subsequent to the illegal search are also extremely psychologically damaging. I feel violated in the most core and fundamental ways possible. I am (or was) a creative writer for fiction, non-fiction, and freelance. Since having the police illegally violate every page of my writing, I can barely look at it without feeling nauseated, sick, frustrated, and angry. I believe this was the point. To prevent me from being able to seriously pursue my career and source of income. Just nine days prior to this illegal search of my writing, I had written a Letter to the Editor in the local newspaper (Logan Daily News) criticizing the militarization and heavy-handed terror tactics of the local rural Ohio police. The police were later caught on body camera video criticizing this letter, laughing about it, and celebrating the fact that they got to arrest me for it.

Additionally, I feel constantly violated knowing that Officer Cluley has stolen naked photos and dating apps from my cell phone. In addition to Romance/erotica themed rough-draft Amazon Kindle eBook writing. Officer Cluley did this with the sanction of law director, Abigail Saving, and her husband Judge Jonah Saving. Because I am an LGBT individual (one of the first to run for office in the entire state just -3 months before this whole situation), I believe that this crime, and the conspiracies parasitic to it, were done with the intent of committing a bias-motivated hate crime.

# V. Relief

Plaintiff respectfully requests that judgment be entered in his favor as follows:

### COUNT I

### FOURTH AMENDMENT (UNLAWFUL SEARCH AND SEIZURE)

### UNLAWFUL DNA COLLECTION

### UNKNOWN NAMED SEORJ GUARD "BROOKS"

A. Declaratory Judgment: Affirming that the Defendants' individual and collective conduct violated Plaintiff Andrew Smigelski's Federal Constitutional rights;

B. Compensatory Damages: Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, embarrassment, humiliation, and potential lifelong injuries and rights violations valued at least $2,000,000.

C. Punitive damages - maximum permitted by law.

D. Equitable Relief: A written admission of the allegations stated in the complaint, an in-person oral apology, and a written admission and apology on the SEORJ's official letterhead

E. Legal Fees and Costs;

F. Discretionary Damages and Relief: Such other financial or equitable relief that the Court deems reasonable and just.

G. Injunctive relief compelling the removal of the unlawfully collected DNA from all databases, including but not limited to those maintained locally, by the State of Ohio, federally, and internationally.

### COUNT II

### FOURTH AMENDMENT (UNLAWFUL SEARCH AND SEIZURE)

### FALSIFIED SEARCH WARRANT

### GREGG CLULEY

A. Declaratory Judgment: Affirming that the Defendants' individual and collective conduct violated Plaintiff Andrew Smigelski's Federal Constitutional rights;

B. Compensatory Damages: Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, embarrassment, humiliation, and potential lifelong injuries and rights violations. Additionally, the lost potential revenue flow of the 1,000+ pages of writing, written as a product, and searched and violated by Officer Cluley prior to publication- causing involuntary abandonment of all involved works. In total, at least $6,000,000.

C. Punitive damages - maximum permitted by law.

D. Equitable Relief: A written admission of the allegations stated in the complaint, an in-person oral apology, and a written admission and apology on the City's official letterhead

E. Legal Fees and Costs;

F. Discretionary Damages and Relief: Such other financial or equitable relief that the Court deems reasonable and just.

G. Injunctive relief compelling the Ohio Public Defender's Office, ACLU, Department of Justice Civil Rights Division, Ohio Innocence Project, a private law firm, or other disinterested, competent, capable, and qualified, legal review organization to review all cases of the officers involved, and overturn the cases that are not proven beyond a reasonable doubt without the inclusion of testimony, statements, affidavits, or involvement, of the named officers.

## COUNT III
## FOURTH AMENDMENT (EXCESSIVE FORCE)
## PHYSICAL ATTACK
## JOSH MOWERY, BEN SKINNER, RYAN GABRIEL

A. Declaratory Judgment: Affirming that the Defendants' individual and collective conduct violated Plaintiff Andrew Smigelski's Federal Constitutional rights;

B. Compensatory Damages: Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, embarrassment, humiliation, and potential lifelong psychological and physical injuries and valued at least $2,000,000.

C. Punitive damages - maximum permitted by law.

D. Equitable Relief: A written admission of the allegations stated in the complaint, an in-person oral apology, and a written admission and apology on the City's official letterhead

E. Legal Fees and Costs;

F. Discretionary Damages and Relief: Such other financial or equitable relief that the Court

deems reasonable and just.

G. Injunctive relief compelling the Ohio Public Defender's Office, ACLU, Department of Justice Civil Rights Division, Ohio Innocence Project, a private law firm, or other disinterested, competent, capable, and qualified, legal review organization to review all cases of the officers involved, and overturn the cases that are not proven beyond a reasonable doubt without the inclusion of testimony, statements, affidavits, or involvement, of the named officers.

## CERTIFICATE OF SERVICE

I, Andrew Smigelski, the Plaintiff Pro Se, certify that copies of the above document have been served upon the counsel for Defendants Mowery, Gabriel, Skinner, and Cluley via Email on May 5, 2021

Michael S. Loughry
175 South Third Street
Suite 100
Columbus, Ohio 43215
**Counsel for Cluley, Skinner, Gabriel.**

Jessica Reese
250 Civic Center Drive
Suite 280
Columbus, Ohio 43215
**Counsel for Mowery**

**Plaintiff Pro Se**
**1015 Bryan Road**
**Sugar Grove, Ohio 43155**
**614-607-1230**
Smigelski.Andy@gmail.com