**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**ANDREW SMIGELSKI,**

**Plaintiff**  ·  **Civil Action 2:20-cv-4812**
**Judge Sarah D. Morrison**
**V.**  ·  **Magistrate Judge Kimberly Jolson**

**GREGG CLULEY et al.**


# Plaintiff's Motion for Summary Judgment against Defendants Mowery, Skinner, Gabriel, Cluley


Plaintiff, Pro Se, Andrew Smigelski moves the court to grant summary judgment against defendants Josh Mowery, Ryan Gabriel, Ben Skinner, and Gregg Cluley. This motion incorporates *Exhibits A-T,* previously filed on a USB Drive in support of Plaintiff's Response in opposition to these Defendants' Motion for Summary Judgment.

This motion is substantially the same as Plaintiff's Response Motion (*Docket 120)* originally filed on August 15, 2022. Some small changes have been made, including the addition of case law and correction of citations. Because much of the evidence involved in supporting these causes of action is video evidence that clearly and plainly shows the events that transpired, and because the law, case law, and US Constitution, clearly show that Plaintiff's rights have been violated, there exists no genuine dispute as to any material fact.

Therefore, while the community at large would benefit from these officers being held accountable at trial in an open and public court, it would be fitting and acceptable under *Rule 56* of the *Federal Rules of Civil Procedure* for the Court to rule in Plaintiff's favor as a matter of Summary Judgment, saving this court and all parties involved the time and resources of pursuing a jury trial.


**Introduction**

In September 2018, Plaintiff, Andrew Smigelski, was subjected to numerous violations of his civil and constitutional rights at the hands of Officers working on behalf of the City of Logan in Hocking County, Ohio. These violations that make up the current Causes of Action are as follows:

1. Fourth Amendment excessive force, perpetrated by Officers Josh Mowery, Ben Skinner, and Ryan Gabriel, during the course of an unlawful arrest, amounting to an unconstitutional seizure.
2. Fourth Amendment unlawful search and seizure perpetrated by Officer Gregg Cluley, subsequent to an illegal search warrant that Cluley falsified in order to gain access to the Plaintiff's home.

Plaintiff has divided his response into two sections- a Narrative of Events - Statement of Facts that thoroughly explains and contextualizes the events leading to the current causes of action, so that The Court can view and understand the indisputable facts and circumstances that led to the current lawsuit. The Narrative of Events itself refutes and contradicts many of the claims of these defendants. The second section, The Argument of Law, offers additional specific refutation of these defendants' claims, supported by case law precedent.


**Narrative of Events - Statement of Facts**

Plaintiff, Andrew Smigelski, has had a connection to Southeast Ohio for his entire life. While living in Grandview Heights and Columbus, Plaintiff would frequently visit his family property outside of Sugar Grove for a restful respite to work on his writing.

In 2017, with the help of his parents, Plaintiff purchased a house in the City of Logan and moved to Southeast Ohio full time, splitting his time between his house in the city in Logan, and the more remote house in the country - outside of Sugar Grove, his current residence.

During his time in Southeast Ohio, Plaintiff had become aware of the pervasive corruption of the region, including among its politicians and law enforcement.

In early 2018, Plaintiff filed to run for office as a civil libertarian, in the Republican primary, against Anti-LGBT incumbent State Representative, Ron Hood.

By May 2018, Plaintiff had visited every town in the 78th district, met voters, and distributed his campaign letter of intent (Attached as *Exhibit A*) to 6,300 households in the district, including to many of the involved officers in this case who are Republican. Among the voters Plaintiff interacted with was then Officer Josh Mowery, at Mowery's house on May 6, 2018, just prior to the May 8th election. Plaintiff testified about this interaction during his deposition.

Plaintiff lost the election in the primary to the incumbent, but continued to be involved in activism, political writing and reading, and community organizing.

During the summer of 2018, Plaintiff's neighbors Ken and Jessica James put up a blue light on their porch, in support of the Thin Blue Line/Blue Lives Matters Movement. Plaintiff, aware of the local police misconduct occurring at that time, including the severe misconduct of Columbus Police Officers, summarized in the Columbus Alive article attached as *Exhibit B*, responded by

putting up a sign in his own yard, criticizing his neighbors for their support of police misconduct, and demonstrating that while they had a right to free expression, rights go both ways, and so did he. Ken and Jessica James got the message and either took down or turned off their blue light. However, the same day, Jessica James also trespassed on Plaintiff's property and stole the sign out of his yard.

While the sign may have been juvenile, its sense of humor was hardly outside of the mainstream political discourse of these last five years. Jessica James may have been offended by the sign, but that doesn't justify her stealing it. Unbeknownst to Plaintiff, Jessica James had not only stolen the sign, but later claimed to have taken the stolen sign to the Logan Police Department, or Hocking County Sheriff's Office (her story varies) to try unsuccessfully to get Plaintiff arrested.

Plaintiff spent Summer 2018 alternating between his home in Logan, and his house in Sugar Grove.  Although there were no further interactions between Plaintiff and the James's, Jessica James continued to hold a grudge and was actively looking to fabricate an excuse to get Plaintiff arrested.

In late August of 2018, to continue his community activism and building his political brand, Plaintiff wrote a Letter to the Editor to the local Logan Daily News, in response to an article glorifying local police militarization, including the purchase and use of Humvees, and a large tank-like vehicle called an MRAP, for the small rural community.

This letter to the editor, which was circulated widely among local law enforcement, including the Logan Police and Hocking County Sheriff's office, is attached as *Exhibit C*.

Around this same time, Ken and Jessica James put back up, or turned back on, the blue light on their porch. At the same time, Ken James began revving up his dirt bike in his driveway, several minutes at a time, sometimes several dozen times a day, starting as early as 7-8:00 AM, and going as late as 11:00 PM - Midnight, or later.

On September 11, 2018, after a week or two of this disruption, as Ken James revved up his dirt bike for the fourth or fifth time that day, Plaintiff, who has ADHD, could not focus past the repeated loud noises. Plaintiff looked up the Logan City Code to confirm that what Ken James was doing was illegal. It was - a minor misdemeanor. At 12:07 PM, Plaintiff called the non-emergency police line to politely ask if they would send an officer out to ask Ken James to desist. This call was answered by Lacy Levering, a friend of the James's, who lived approximately 300 feet away, on the other side of them. As soon as Plaintiff gave the James's address, Lacy Levering disconnected the call and made no attempt to call Plaintiff back. Despite Plaintiff's repeated requests and subpoenas over these last 4 years, the Logan Police Department is continuing to withhold and refuse to produce this phone call.

A few hours after this unsuccessful attempt at peaceful police intervention, Jessica James arrived home from work. Plaintiff asked her to give back the sign that she had stolen. She refused and immediately began making threats, including "I'll see you in prison over that." Ken James also came over and a brief argument ensued at the propertyline. Plaintiff criticized the James' blue light, and their "Back The Blue" mentality, especially in the face of the serious misconduct committed by local Columbus Police Officers during that time period in the summer of 2018, including distributing child pornography, making retaliatory politically motivated arrests, and just two weeks prior, attempting to rape and then murdering a woman on the West side of Columbus.

The James's said they were sure those weren't true, that there were "two sides" to every story, and that even if what Plaintiff said was true, they still believed in and supported the "Thin Blue Line" because local police in Logan/Hocking were different. Additionally, they claimed that the local police were their "friends and family," were on their side, and would have their backs. And that Plaintiff, who was an outsider in the community, "didn't know who (he) was messing with," and wouldn't have anyone to help him if he needed it, including "If (his) house caught on fire." (*Exhibit D - Mowery Body Cam 1 AXON_Body_2_Video_2018-09-12_0716* at 06:35-06:47)

Plaintiff did not threaten Ken or Jessica James, or their children. However, Plaintiff did warn them that, since they supported "Law Enforcement" so strongly, any time they violated the law, he would call the police, so the law could be enforced accordingly, as he had done for the first time just earlier that day. The argument ended there and both sides left for their respective homes.

On September 12, 2018 at around 7 AM,  as Plaintiff was gathering his food, clothing, writing, and supplies, to return to his house in Sugar Grove for a few day trip, he saw a Logan Police vehicle drive past his house (the last one on a dead-end street), and witnessed it circle around in the privately-owned church parking lot across from Plaintiff's home.

Plaintiff grabbed his cell phone and went outside to record the incident, but by the time he got outside, the vehicle was gone. Plaintiff became concerned that the police harassment his neighbors implied the day before had already begun, and instead made a brief video and audio recording from his front porch, for the purpose of record, recounting the threats his neighbors had made the before, and briefly showing their house on video as visual context for who made the threats. While he was doing so, Jessica James left her house, walked to her car, turned and smiled at Plaintiff, waved at him, and said "Have a nice day."  Jessica James then left her home, apparently to go meet up with her friend then-Officer Josh Mowery at the police station. After a very brief but polite conversation with the unrelated neighbor across the street, Plaintiff went back into his home.

At the police station, then-Officer Mowery turned on his body camera immediately before entering the Police Station (*Exhibit D - Mowery Body Cam 1 AXON_Body_2_Video_2018-09-12_0716* at 00:00-00:12 ). Officer Mowery began interacting with his friend Jessica for nine and a half minutes. Mowery asks Jessica James if she feels

threatened in any way, which she affirms she does not (*Exhibit D - Mowery Body Cam 1 AXON_Body_2_Video_2018-09-12_0716* at 1:05-1:12) .

Mowery lets Jessica James continue to ramble about a variety of perceived or fabricated grievances, including the length of Plaintiff's Lawn , which Mowery acknowledged having seen when he drove past Plaintiff's house just minutes prior (E*xhibit D - Mowery Body Cam 1 AXON_Body_2_Video_2018-09-12_0716* at 7:04-7:08).

Mowery briefly leaves the lobby, goes to a backroom, and researches the Ohio Revised Code definition of "Menacing." He returns to the lobby, and again coaxes Jessica James into saying the light which the James's had turned off or taken down was stolen, then tells her that the purportedly "missing" light amounted to menacing (*Exhibit D - Mowery Body Cam 1 AXON_Body_2_Video_2018-09-12_0716* at 4:15-4:34)  At this point, it's clear that Mowery is desperately looking for any excuse at all to arrest the Plaintiff.

Jessica James recounts her smiling and waving at Plaintiff, as well as her husband making jokes and laughing at Plaintiff's expense (E*xhibit D - Mowery Body Cam 1 AXON_Body_2_Video_2018-09-12_0716* at 8:22-8:33)

Mowery is clearly disappointed with Jessica's demeanor and what he is hearing, and within seconds of hearing it, turns away from Jessica and shuts off his body camera (E*xhibit D - Mowery Body Cam 1 AXON_Body_2_Video_2018-09-12_0716* at 8:50-8:59).

Nowhere during this 9.5 minute interaction is there mention of what would later become the basis of the criminal charges against Plaintiff - a threat against Ken or Jessica James or their children.

10 minutes after shutting off his body camera, Mowery turns it back on. At this point, he is no longer in the lobby of the police station, he's in a backroom, standing 3-4 feet from Officer Gregg Cluley, who is staring intently at his phone and scrolling (*Exhibit E - Mowery Body Cam 2 AXON_Body_2_Video_2018-09-12_0735* at 00:00-00:13). The LPD has refused to produce records from this (or any) work phone, so it stands to reason that Gregg Cluley may be viewing the Plaintiff's Letter to the Editor on the Logan Daily News website. Although the body camera is muted at this time, it is clear that Mowery and Cluley had just engaged in a conversation.

From the back room of the Police Station, Mowery walks out into the lobby, unmutes his body camera, and begins re-interacting with Jessica James in the lobby. It's at this point that any reference to a "threat" first comes up. Mowery makes reference to a "threat" as if referencing something Jessica James said while the body camera was turned off. Jessica James goes along with it, and Officer Mowery tells her that the Police Dispatcher (Lacy Levering) has called the jail to make sure there's a bed available. Mowery informs Jessica James that Plaintiff will be immediately, summarily, and warrantlessly arrested. (*Exhibit E - Mowery Body Cam 2 AXON_Body_2_Video_2018-09-12_0735* at 00:30-01:00)

Before leaving the Police Station, Mowery asks Jessica James if she'd ever seen the Plaintiff with a firearm, which she denies (*Exhibit E - Mowery Body Cam 2 AXON_Body_2_Video_2018-09-12_0735* at 02:26-02:40 ).

Jessica James continued insulting Plaintiff and his family, including making fun of Plaintiff's sister who has autism (*Exhibit E - Mowery Body Cam 2 AXON_Body_2_Video_2018-09-12_0735* at 02:54-02:58).

Mowery then tells Jessica James that he'll visit her at work after the arrest, as he already knows where she works (*Exhibit E - Mowery Body Cam 2 AXON_Body_2_Video_2018-09-12_0735* at 03:18-03:22).

From there, Mowery leaves the Police Station and begins driving to Plaintiff's home to affect the illegal warrantless arrest.

When Officer Mowery arrived at Plaintiff's House with Eli Burchfield, Mowery went straight to the front door, while Eli Burchfield began walking to and through the unfenced portion of Plaintiff's backyard. This was also trespassing and an illegal search, as Plaintiff's yard extended all the way to the treeline.

While Mowery was on Plaintiff's front porch, Plaintiff was outside on his back deck/porch reading a few pages while taking his dog, Dugin, out for the first time that morning.

When Officer Mowery first saw the gun on the Plaintiff's couch, Plaintiff was not in the same room, or even in the house at the time. It was not until Mowery began knocking on the door, to lure the Plaintiff into the room, that Plaintiff was in the same room as the gun. Mowery later claimed that he didn't see the gun until Plaintiff looked at it, but the video clearly shows this to be false. (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 00:50-01:13 and 18:12-18:17). Mowery repeatedly demanded that Plaintiff come out of his house, while Mowery brandished a gun, but refused to identify a reason (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746*  at 1:14-2:55)

 Mowery notified Officer Eli Burchfield that there was a gun in the home, pointed it out, and orally affirmed that the gun was not in Plaintiff's hand, but on the couch in the living room (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 2:14-2:16).

Mowery then told Officer Burchfield "To Activate SRT" (Call in the SWAT Team), while still refusing to identify the reason the officers were at the house (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 2:43-3:58)

Plaintiff legally owned the legally purchased firearm. This handgun is the only firearm that Plaintiff owned, and he owned it for self protection, essentially a necessity, given the amount of time that he spent at the remote house outside Sugar Grove, far from city civil or protective services. Plaintiff believed and still believes that this was an intelligent and responsible decision

for his own safety, especially considering that LGBT individuals are 4x as likely to be the victim of a violent crime as the general public, according to the Williams Institute at UCLA, *Exhibit G.*

The reason the firearm was on the couch that day is because Plaintiff removed it from its pouch, while looking for its holster, in preparation for his trip to Sugar Grove. Plaintiff would later learn that the missing holster was in his vehicle the whole time.

When the Plaintiff heard the knock on his door, he went inside his home, through his bedroom and kitchen, and saw Josh Mowery with his face pressed against the door, and a handgun in his hand, held beneath the body camera, intentionally out of sight. Plaintiff knew something wrong was happening. He knew he hadn't done anything wrong, saw that Mowery was not presenting a warrant, knew he didn't have to answer the door to an officer committing a "knock-and-talk", and knew that Officers aren't allowed to randomly show up to someone's door to arrest them on a whim.

The Ohio Revised Code Section 2935.03 does provide a narrow parameter for making a warrantless misdemeanor arrest, which is what Mowery alleged. However, the requirements outlined in the ORC for this type of arrest had not been complied with, making Mowery's attempted arrest unwarranted and unlawful. This was truly an illegal arrest.

Plaintiff correctly assumed that Mowery was one of the "friends and family" that the James's had referenced the day before, and realized that Mowery was there for retaliatory purposes. Upon seeing this, Plaintiff immediately began making a recording on his cell phone, and then also on his laptop.

Officer Mowery threatened additional retaliatory charges if Plaintiff didn't immediately leave his home, but didn't tell Plaintiff he was under arrest or identify why or on what charges he was there to begin with (*Exhibit J Plaintiff Phone Vid 1 - VID_20180912_075233* at 00:00-01:05) .Plaintiff knew his rights and remained in his living room.

Mowery just kept yelling "Come here Andrew!" after the SRT had already been activated. Mowery did not even tell Plaintiff that Mowery was there to arrest him until Mowery had been at Plaintiff's home for four minutes. (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 03:57-04:10 and Exhibit L - Burchfield Body Cam 1368_Colorado_Ave at 3:36-3:45)

Plaintiff stayed within his rights and did not submit to the retaliatory arrest (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 04:17-04:27)

This lack of immediate compliance angered Josh Mowery, who began working with Eli Burchfield to call in every available officer from the Logan Police Department and Hocking County Sheriff's Office. Within minutes, Plaintiff's entire street was full of police vehicles, and officers with handguns, shotguns, and AR-15 Assault Rifles surrounded Plaintiff's entire home and began pointing their weapons at Plaintiff.

A number of officers stormed onto Plaintiff's porch and began pointing guns at Plaintiff through his windows. Plaintiff was confused and terrified, still not understanding why Officer Mowery was at his home to begin with, or why the situation escalated so rapidly to have dozens of armed men surrounding him and pointing guns at him. Mowery repeatedly affirms, as he had from the beginning, that the gun was never in Plaintiff's hand, but sitting on the couch (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 02:14-02:16 and 08:24-08:26)

At this point, Mowery backed off and went to his police cruiser to grab his own Assault Rifle for potential use against Plaintiff. (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 07:03-07:36).

While Plaintiff was still in his home, within his rights, Mowery kept saying "Just gas him out" (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 09:54-09:56 and 11:49-11:51)

While Mowery was near his Police Cruiser, an officer asked him what started the situation. Mowery claimed the family next door said Plaintiff had threatened them. Mowery also totally denied knowing the family: "I'm not sure of their names. I have it at the office" (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 27:45-27:48)

While this was happening,  Deputy Caleb Moritz walked up to Plaintiff's door with a ballistic shield in his hand. Deputy Moritz began making his own false accusations - that Plaintiff had threatened people with a gun. Plaintiff told Moritz that that was false (*Exhibit K Plaintiff Phone Vid 2 -VID_20180912_082517* at 00:20-01:00 and 06:00-06:03)

These contradicting stories and allegations show that local law enforcement wanted to revenge arrest Plaintiff, but hadn't practiced their story enough to make it cohesive or believable.

Plaintiff asked if he was going to be slammed around and handcuffed, which Deputy Moritz promised would not happen (*Exhibit K - Plaintiff Phone Vid 2 -VID_20180912_082517* at 1:38-1:50)

Plaintiff asked Deputy Moritz if he had a search warrant or arrest warrant. Moritz said they had neither, and Plaintiff told him they shouldn't be at his home (*Exhibit K - Plaintiff Phone Vid 2 -VID_20180912_082517* at 2:30-2:55).

Deputy Moritz repeatedly asked to do a search of Plaintiff's home, and to retrieve Plaintiff's firearm, but Plaintiff repeatedly explicitly denied consent (*Exhibit K - Plaintiff Phone Vid 2 -VID_20180912_082517* at 17:32-17:55 ).

Plaintiff pieced together that the entire standoff was likely retaliation for Plaintiff's Letter to the Editor, published nine days prior. He mentioned this to Deputy Moritz who adamantly denied this was the reason, and further denied any knowledge of the Letter to the Editor at all. (*Exhibit K - Plaintiff Phone Vid 2 -VID_20180912_082517* at 07:16-08:00). This was later proven to be

another lie, as Deputy Moritz is later caught on video discussing the letter with advanced knowledge, with a circle of other officers and deputies, including Gregg Cluley (*Exhibit M - Skinner Body Cam Colorado_Ave_Stand_Off* at 39:00-40:10).

At this point, Plaintiff just wanted the officers to leave his home and leave him alone. But the officers refused to completely deescalate the situation. Plaintiff wanted to deescalate the situation and have the officers leave. He did not want to write a statement at gunpoint, but was told that he had to, that it was the only way to deescalate the situation, and that he had to write it on the porch. Plaintiff reluctantly agreed, as the only other option seemingly available was getting murdered inside of his own home for a crime he didn't commit.

Plaintiff sat on a chair on his porch and was given a form. The form said it was "Voluntary" and affirmed that the Plaintiff was not under arrest. While writing this, Moritz again expressed intent to go into Plaintiff's home, which Plaintiff again denied. In response, Moritz demanded that Plaintiff write the statement (*Exhibit K - Plaintiff Phone Vid 2 -VID_20180912_082517* at 17:32-17:55)

As Plaintiff was writing this (in)voluntary statement, Mowery again came up on Plaintiff's porch. Plaintiff was reading aloud what he wrote on the statement form as he wrote it. When the part about the James's friends and family on the police force came up, Moritz asked Mowery about it. Mowery, unknown to the plaintiff at that time, was the exact friend/family Plaintiff was writing about. Because of Mowery's secret knowledge and guilt in the whole unlawful situation, Mowery misinterpreted Deputy Moritz's question and instead panicked and again denied knowing the James's - shaking his head and saying "Jessica is her first name, that's all I can remember. (*Exhibit K - Plaintiff Phone Vid 2 -VID_20180912_082517* at 24:00-24:23 and *Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 33:27-33:39)

Plaintiff finished writing his statement. Moritz again expressed intent to enter Plaintiff's home, this time not asking, but stating that he was going to do it. (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 43:05-43:25) Plaintiff had already expressly denied police consent to enter his home several times at this point, and began another recording on his cell phone.

It's at this point, because Plaintiff had repeatedly refused access to his home, that Deputy Moritz turned to Officer Mowery and asked if he had "PC" - Probable Cause for an arrest. Mowery said that he did. Plaintiff knew for a fact that Mowery had no cause for an arrest at all, and asked what Mowery's probable cause for an arrest was. Mowery hadn't planned that far ahead and was still trying to plan a cohesive and believable story and refused to answer, instead saying "We'll talk about that. We're not going to have court out here on your porch." (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:00-44:12)

Plaintiff was told to stand up and be arrested.  Plaintiff stood up within eighteen seconds, while vocally protesting the illegal arrest. (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:14-44:32) Plaintiff immediately put his free left

hand behind his back. However, Plaintiff was confused and scared and didn't know what to do with his cell phone, still recording in his right hand. Deputy Moritz tried to snatch the phone out of Plaintiff's right hand, while saying "I'll take your phone so it doesn't get broke." (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:32-44:37).

Plaintiff knew that if he gave the phone to a law enforcement officer, they would consider that a voluntary surrender, and would use that as implied consent to give them an excuse to search the device. Plaintiff didn't consent to a search of his phone, and made that verbally clear, while still physically complying.

Phones sitting in pockets don't spontaneously break. Deputy Moritz knew what was coming, he was handing Plaintiff over to Josh Mowery so Mowery could physically attack the Plaintiff and they could again ask for consent to enter Plaintiff's home after Plaintiff had been brutalized and would be less able to object.

Plaintiff quickly slipped his phone into the pocket of his pajama pants and put his now-free right hand behind his back, giving it to Officer Mowery, who took hold of it to be handcuffed. (Exhibit I -Computer recording at 34:59-35:16) At this point, Mowery's body camera clearly shows both of Plaintiff's hands behind his back, with both of Mowery's hands holding onto them, with a pair of handcuffs out.(*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:40-44:44 and *Exhibit O - Hands Behind Back*) Another officer, Chris Smith, held onto Plaintiff's arms and jacket and jerked Plaintiff around to make it look like Plaintiff was struggling. Plaintiff was not struggling or trying to get away. Plaintiff was surrounded by literally dozens of officers, many of whom were still pointing guns and tasers directly at Plaintiff. While Plaintiff was verbally protesting his unlawful arrest, he was physically complying in every way. Mowery could have chosen to handcuff Plaintiff at this point, but became enraged when Plaintiff again explicitly stated that "I don't give consent to this. I don't give consent to any searches." (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:32-44:43).

At this point, Mowery, in a fit of rage and fury at the invocation of Plaintiff's rights, chose not to handcuff the Plaintiff, and instead chose to throw the handcuffs on the ground, grab Plaintiff by the jacket collar, slam plaintiff hard against the side of Plaintiff's own home, and then while Plaintiff was on his knees, come up behind Plaintiff, grab the back of Plaintiff's neck, and slam Plaintiff's head down into the concrete ramp and the boots of another officer (Ryan Gabriel). (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:40-45:16). Plaintiff's arms briefly slipped out from behind his back as he was being slam-thrown onto the ground. Plaintiff could not immediately put his arms back behind his back because he already had several officers on top of him, pinning him down.

Officer Ben Skinner, who was on the other side of Plaintiff's home. He had already told another Officer he was going to stab Plaintiff's fenced-in Dachshund (*Exhibit M - Skinner Body Cam Colorado_Ave_Stand_Off* at 19:17-19:26), and had excitedly announced his intent to taser Plaintiff for no reason (*Exhibit M - Skinner Body Cam Colorado_Ave_Stand_Off* at 08:50-09:00). Then Skinner began telling the other officers to both taser and shoot the Plaintiff: "He's gonna

get tasered. Crack him. Crack him. Crack him. Crack him. Crack him. Crack him with the taser. Shoot him. Just go ahead and hit him. Go ahead and hit him. Go ahead and hit him. Go ahead and hit him." (*Exhibit M - Skinner Body Cam Colorado_Ave_Stand_Off* at 35:16-35:29)

When Skinner reached Plaintiff's porch ramp, multiple other officers were pinning Plaintiff to the concrete porch ramp and Plaintiff was screaming in pain and terror.  Skinner literally shoved his way through, between the other officers, and began punching Plaintiff in the spine with his taser, directly above Plaintiff's heart. (*Exhibit M - Skinner Body Cam Colorado_Ave_Stand_Off at 35:40-35:55)* The punches were so hard that you can see Plaintiff's jacket crumple under the force of the taser as Skinner does this. (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:50-45:00)

While Plaintiff was on the ground on the concrete ramp, he was handcuffed by Officer Mowery, who clicked the handcuffs on as tight as they would possibly go. There, while still on the ground, Plaintiff was thoroughly searched, including having his pockets pulled out by Officer Chris Smith. Plaintiff's phone was taken. Plaintiff did not have any other objects on him whatsoever. This is explicitly confirmed when an officer asks "He got anything on him?"
To which Officer Smith replied: "Nope." (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 45:14-45:28)

This search, and the explicit audio confirmation that Plaintiff didn't have anything on him, including any weapons, was done only six feet away from Gregg Cluley, who watched the whole thing and was clearly within direct earshot. (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 47:03-47:05 and *Exhibit H - Body Cam AXON_Body_2_Video_2018-09-12_0750-3 - Clip* 00:42-00:45 and *Exhibit L - Burchfield Body Cam 1368_Colorado_Ave* 46:36-46:39)

After this, Plaintiff was stood up by the officers. Deputy Moritz again asked to go into Plaintiff's house to retrieve Plaintiff's firearm. Plaintiff agreed under duress at this point. Although Plaintiff had previously made it clear multiple times that the officers were not allowed inside his home, Plaintiff was terrified that he would be violently attacked again if he refused consent again. Plaintiff was also deeply concerned that if the officers were inside of his home when he wasn't present, that the officers would injure, torture, or kill his dog. This fear was not unfounded- it's exactly what Officer Skinner threatened to do just minutes prior.

It's at this point, while the officers are taking Plaintiff's handgun from his house, that you can see Plaintiff's handcuffed hands, turning white from lack of circulation, with his skin painfully pinched and torqued under the metal.  *Exhibits P,Q,R, - Tight Handcuffs 1,2,3*

From there, Plaintiff was put in the back of Officer Mowery's police car. Plaintiff was not read his Miranda rights, so he invoked them himself. Despite this, Plaintiff was not provided an attorney at his arraignment the next day.

Plaintiff was taken to the Southeast Ohio Regional Jail by Officer Mowery, and handed over to Guard Lisa Brooks for booking and processing.

While Plaintiff was being booked at the SEORJ, Officer Cluley was writing and applying for a search warrant. The "standoff" at Plaintiff's home ended by approximately 8:35 AM. By 9:50 AM, Officer Cluley had not only written the search warrant, but had presented it to Judge Jonah Saving, the husband of the prosecutor in the case, Abigail Saving.

The search warrant written by Gregg Cluley was hastily written, replete with substantial falsehoods, and was written in such a way to function as a general warrant. The search warrant affidavit, as well as a copy of the search warrant with the false information blacked-out, are attached as *Exhibits S and T*. Additional details of the warrant, and the search itself, are provided in Plaintiff's Second Amended Complaint, as well as in the following Arguments of Law section.

**Argument of Law**

In light of these indisputable facts, Defense Counsel is left to argue that Plaintiff's right to be free from these abuses of his civil and constitutional rights were not clearly established at the time that the abuses occurred, however this is not true.

Many of these violations are facially unconstitutional. Any reasonable officer that swore an oath to the Constitution would know that this conduct and these violations were clearly wrong. Additionally, the Sixth Circuit Court has specifically affirmed Plaintiff's right to be free from these abuses through established case law precedent.

**Defendants Mowery, Skinner, and Gabriel's use of force against Plaintiff during the course of the arrest was excessive and unconstitutional.**

Despite Defense Counsel's claims to the contrary, including multiple false statements that are disproven by the record of evidence, Officers Mowery, Skinner, and Gabriel, did use excessive force against Plaintiff. This force was both excessive in the circumstances in which it was used, and clearly defined as unconstitutional, facially and as defined by the precedent established by the Sixth Circuit Court.

The majority of the Defendants' defense against Plaintiff's excessive force claims center around the false idea that Plaintiff was somehow actively resisting arrest. As the evidence shows, this isn't true.

Defense Counsel first attempts to claim that Plaintiff was resisting arrest in the approximately 30 second period between when Plaintiff was sitting on his porch chair and told he was under arrest, and when Plaintiff fully put both of his hands behind his back to be handcuffed. As shown by the evidence, and explained in the previous Narrative of Events section, Plaintiff was verbally

protesting the false arrest, while he was physically complying as quickly as possible while trying to understand the developing situation. However, these claims by Defense Counsel are totally irrelevant anyway, because that's not when the violent attack of excessive force was perpetrated.

It was not until Plaintiff had fully complied with the officers' orders and clearly placed both hands behind his back, that Mowery attacked the Plaintiff by jerking his collar down and slam-throwing Plaintiff against his home, then coming up behind Plaintiff, who was on his knees in pain, before finally slamming Plaintiff's head and neck down into the concrete and the boots of Officer Ryan Gabriel.

When Plaintiff had his hands behind his back, he was not struggling with the officers, nor was he attempting to "swat away" the Officers' hands as Defense Counsel claims. Plaintiff was verbally protesting the false arrest, and the repeated attempts by the Officers to force Plaintiff to allow them consent to enter Plaintiff's home. While Plaintiff did say "No!" while the Officers were seemingly in the process of handcuffing the Plaintiff, he was not fighting the action of the handcuffing itself, but verbally protesting the entire circumstance, which is why the "No!" was immediately followed by: "I don't give consent to this. I don't give consent to any searches."

Plaintiff was swaying slightly while the officers had his hands behind his back, but this wasn't to fight the arrest, or try to get away. It was Plaintiff struggling to maintain his balance while being jerked in different directions by multiple Officers - Chris Smith, and Josh Mowery, who both had hands on Plaintiff's arms and hands, and who weighed several times more than the Plaintiff.

Officer Mowery could have chosen to handcuff Plaintiff at this point, while Officer Smith was holding Plaintiff's arms, but Mowery became enraged at Plaintiff again invoking his constitutional rights, and chose to attack Plaintiff instead.

While Plaintiff was being thrown and shoved onto the ground, his arms briefly slipped out from behind his back from the sheer force of the attack. At this point, Officer Mowery hopped on top of Plaintiff from behind and yelled "Stop Resisting!" This is not because Plaintiff was actually actively resisting arrest, but because this is a common phrase that corrupt officers use to make it seem like a compliant arrestee is resisting arrest.

While Plaintiff was pinned to the ground by multiple Officers, Officer Ben Skinner, who had previously encouraged excessive force, expressed his own intent to use excessive force, and threatened Plaintiff's dog, literally shoved his way past other officers to punch Plaintiff repeatedly in the spine with his taser. Despite Defense Counsel's clearly false claims that Skinner "Placed the taser near" (but not on Plaintiff), and "didn't use any force at all", the video shows this is not the case. Officer Skinner's gloved hand can clearly be seen striking Plaintiff in the spine multiple times. The amount of force Skinner used can be seen both by the crumpling of Plaintiff's jacket, and Skinner's flexed forearm muscles as he made the strikes.

In both the use of excessive force by Officers Mowery and Skinner, several things are clear: Plaintiff was verbally protesting the false arrest, but was physically complying with the Officers' orders, and Plaintiff posed no threat to the officers.

The idea that Plaintiff was struggling, or trying to break free and get away, as Defense Counsel alleges, is beyond preposterous. Besides the multiple officers who were physically grabbing and pinning Plaintiff, Plaintiff was also surrounded by approximately 19 other Officers and Deputies, many of which had handguns and assault rifles pointed at Plaintiff.

The right of a Plaintiff who is not actively resisting officers, and who does not present a threat to officers, has been established several times over within this Circuit.

In *Butler v. City of Detroit, 936 F.3d 410, 425 (6th Cir. 2019)* the court found:

*" Taking the facts in the light most favorable to Butler—that he was fully cooperative and yet was gratuitously 'slammed' into the wall—Meadows has no claim to qualified immunity at this stage of the litigation. Assaulting an unarmed and compliant individual has been a clearly established violation of the Fourth Amendment for decades." Butler v. City of Detroit, 936 F.3d 410, 425 (6th Cir. 2019)*

This case bears a striking resemblance to the facts of the case at hand, including the slamming of a compliant suspect against a wall.

Further, in *Jacobs v. Alam, 915 F.3d 1028, 1041–42 (6th Cir. 2019),*  the court ruled that:

*"Our caselaw is replete with instances in which we have denied officers qualified immunity when the facts suggest—at least taking them in the light most favorable to the plaintiff—that the suspect did not pose a serious threat to the officer. . . . Thus to the extent the district court denied Alam qualified immunity because he effectuated an alleged unconstitutional seizure, we affirm this part of the district court's order." Jacobs v. Alam, 915 F.3d 1028, 1041–42 (6th Cir. 2019)*

This case affirmed that using force against a suspect who did not pose a threat to the officer, as is true of the Plaintiff in the current case,  was clearly excessive.

In *Brown v. Lewis, 779 F.3d 401, 419 (6th Cir. 2015)* the court ruled on the constitutionality of throwing a compliant suspect to the ground in the process of handcuffing:

*"Cases in other circuits provide directly analogous examples, revealing that pulling a compliant detainee out of her car and throwing her to the ground in the process of handcuffing her is clearly established excessive force." Brown v. Lewis, 779 F.3d 401, 419 (6th Cir. 2015)*

This case is obviously very similar to the current case, in that it describes the exact same use of force that Mowery used.

The court decision in *Moser v. Etowah Police Dept., --- F.4th ----, 2022 WL 619830 at \*4 (6th Cir. 2022)* made a ruling on a very similar use of force to the above:

*"By September 2017, it was clearly established in this circuit that a person has a constitutional right to be free from injury-threatening physical force when he or she is not actively resisting the police, and Davis violated this right by taking Moser to the ground with such force that she broke two bones and then pinning her to the ground. Put another way, since a reasonable juror could conclude that Davis knew Moser was not actively resisting arrest, Davis was not entitled to throw Moser to the ground and pin her there." Moser v. Etowah Police Dept., --- F.4th ----, 2022 WL 619830 at \*4 (6th Cir. 2022)*

Finally, in regards to slamming compliant suspects against things, *Miller v. Sanilac County, 606 F.3d 240, 253–54 (6th Cir. 2010)* ruled:

*" We believe that a jury could reasonably find that slamming an arrestee into a vehicle constitutes excessive force when the offense is non-violent, the arrestee posed no immediate safety threat, and the arrestee had not attempted to escape and was not actively resisting." Miller v. Sanilac County, 606 F.3d 240, 253–54 (6th Cir. 2010)*

The decision in *Shreve v. Jessamine Cnty. Fiscal Ct., 453 F.3d 681, 688 (6th Cir. 2006)* offers a decision similar to the force used by Officer Ben Skinner, in which gratuitous force was used against a suspect who was already "helpless and incapacitated", as was Plaintiff in this case while he was pinned to the ground:

*"Moreover, because Sixth Circuit case law supports Shreve's right not to be struck and jumped on gratuitously, qualified immunity is not available for lack of a 'clearly established' right… Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest. In Phelps, we held that Adams clearly established in 1991 the unconstitutionality of the use of gratuitous force against helpless and incapacitated suspects during arrest." Shreve v. Jessamine Cnty. Fiscal Ct., 453 F.3d 681, 688 (6th Cir. 2006)*

Regarding the excessively tight handcuffing by Officer Mowery, Defense Counsel argues that Plaintiff should have complained about the pain the handcuffs were causing him. The premise behind this is absurd. Officer Mowery had just inflicted violent pain upon Plaintiff. It is objectively unreasonable to expect Plaintiff to complain to that same officer. Doing so may well have simply resulted in additional violent attacks against Plaintiff by Officer Mowery, who had just minutes before attacked Plaintiff for asserting his constitutional rights.

The Sixth Circuit has repeatedly held that excessively tight handcuffing amounts to unconstitutional excessive force. In *Morrison v. Board Of Trustees Of Green Tp., 583 F.3d 394, 401 (6th Cir. 2009)* the court ruled:

*"The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure. This right was 'clearly established' for qualified immunity purposes at the time of Amanda's seizure on October 30, 2002." Morrison v. Board Of Trustees Of Green Tp., 583 F.3d 394, 401 (6th Cir. 2009)*

The Sixth Circuit reaffirmed the right to be free from excessively tight handcuffing in *Hughey v. Easlick, 3 F.4th 283, 293 (6th Cir. 2021)*:

*"No doubt, when we view the facts in the light favoring Hughey, as we must on summary judgment, Easlick violated Hughey's clearly established rights. We have held that the right to be free from too-tight handcuffing had been 'clearly established' by 1991. As we pointed out in McGrew, we clearly established that handcuffing that results in wrist marks is unconstitutional no later than 2009, when we issued Morrison. At bottom, 'this Court [has] directly and unequivocally determined, time and time again, that unduly tight or excessively forceful handcuffing is a clearly established violation of the Fourth Amendment." Hughey v. Easlick, 3 F.4th 283, 293 (6th Cir. 2021)*

Because Josh Mowery was intending to perpetrate an arrest, without a warrant, and without following the legal guidelines for making a warrantless arrest as established in ORC 2935.03, an additional instance of case law can be convincingly argued.

In *Williams v. Maurer, 9 F.4th 416, 440 (6th Cir. 2021)* as in this case, the officers were committing conduct that would normally require a warrant, and that didn't meet exigent circumstances (The purported reason for Josh Mowery's cause for arrest was a made up threat that supposedly happened the day before *Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 17:53-17:55), the officers had no legal right to be at the home committing the conduct that occurred and this, any forces effectuated during the course of the illegal activity must be considered excessive:

*"As explained above, it is 'clearly established that warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law.' Likewise, it is clearly established that '[g]ratuitous violence is never reasonable' because 'there is "simply no governmental interest" justifying gratuitous violence.' If Defendants forcibly entered Mitchell's home armed with neither a warrant nor an exception to the warrant requirement, the use of any amount of force to effectuate this unconstitutional action constituted unreasonable 'gratuitous violence.' Put differently, '[o]f course, if Defendant[s] had no right to be inside the home, then [they] had no right to use force.' Accordingly, assuming the absence of exigent circumstances, viewing the evidence in the light most favorable to Mitchell, when Defendants forcibly slammed Mitchell's door open and hit her knee, they violated her clearly established Fourth Amendment right to be free from excessive force." Williams v. Maurer, 9 F.4th 416, 440 (6th Cir. 2021)*

Finally, regarding the excessive force claims, although Officer Ryan Gabriel may have used slightly less force than Officers Mowery and Skinner, Sixth Circuit Court precedent has established that he is not absolved of his involvement in helping Mowery use excessive force,

including helping him put on the excessively tight handcuffs.
In *Bletz v. Gribble, 641 F.3d 743, 754 (6th Cir. 2011)* the court ruled:

*"Under well-established Sixth Circuit precedent, a police officer may be responsible for another officer's use of excessive force if the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." Bletz v. Gribble, 641 F.3d 743, 754 (6th Cir. 2011)*

In the current case, not only did Ryan Gabriel supervise the use of force, help pin Plaintiff to the ground, and actively help Josh Mowery apply the excessively tight handcuffs (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 44:47-45:15, he seems to have enjoyed his role in contributing to excessive force- telling another officer a few minutes later "That was fun." (*Exhibit F - Mowery Body Cam 3 AXON_Body_2_Video_2018-09-12_0746* at 47:58-48:03)

Because Officer Ryan Gabriel was not just another Officer, but was Police Captain and therefore Ranking Officer on the scene, directly supervising Officer Mowery during the excessive force incident, he should also be held accountable on the basis of Summary Judgment.


**Gregg Cluley's search warrant is unconstitutional on several different levels.**

First are the obvious lies. Gregg Cluley lied about Plaintiff opening the door with a handgun in his hand. Defense Counsel tries to distract from this by saying that there was a gun in Plaintiff's home, but that's not what Gregg Cluley swore under oath was true. Additionally, Defense Counsel is forced to admit that Plaintiff never had a knife, despite Cluley swearing that also was true.

Cluley is now attempting to cover up for his previous falsified affidavit by swearing another false affidavit. This can't be taken seriously, as Cluley has already been shown to lie on sworn affidavits. Although Cluley never identified where the information in his original affidavit came from, through this new affidavit, Cluley also attempts to shirk off the blame onto non-party Eli Burchfield by saying:

"The information contained within the search warrant was based largely upon information that was relayed to me by Officer Eli Burchfield."

But Gregg Cluley refuses to elaborate what information specifically conveyed, or when, or how. This is because Cluley isn't telling the truth. Officer Burchfield is clearly seen on his own body camera video repeatedly acknowledging that the firearm was on Plaintiff's couch, not in his hand. He also makes this clear to every officer on the scene. (*Exhibit L - Burchfield Body Cam 1368_Colorado_Ave* at 1:53-1:56 and 3:28-3:32 and 4:49-4:52). If Cluley would have asked any officer on the scene, he would have gotten information that would have directly contradicted what he swore in his search warrant. Even Officer Skinner, when asked by Officer Ryan Gabriel,

questions why a search warrant would even be relevant "I don't know. I don't know what the initial call was." (*Exhibit M - Skinner Body Cam Colorado_Ave_Stand_Off* at 34:37-34:42)

If Officer Burchfield were to offer a sworn affidavit that he intentionally lied to Gregg Cluley so Cluley could falsely obtain fabricated probable cause, perhaps that would be a plausible defense for Officer Cluley, and Eli Burchfield could be charged with felony deprivation of rights. This obviously didn't happen, it's only Clulely's claim that an interaction occurred. Even if Officer Burchfield did this, it still couldn't explain away Cluley's lie about the knife, which Cluley witnessed was false from only a few feet away.

These egregious sworn falsehoods make Cluley's search warrant facially unconstitutional. Any reasonable officer would know that these lies violate the clearly established core of the Fourth Amendment.

Beyond the falsehoods, Cluley's search warrant is also unconstitutional because it blatantly disregards the necessary specificity and particularity that the Fourth Amendment requires.

Cluley made no attempt to link the alleged reason for arrest - Jessica James's claims that she had been threatened - to anything inside of Plaintiff's house, or anything Cluley wanted to search for or seize. Cluley listed a number of items to be seized: "*Firearms, ammunition, accessories, contraband, writing pertaining (Plaintiff's) thought process, cell phones, computers, and the contents of Plaintiff's cell phone*" but not a single one of these was mentioned by Jessica James. Cluley didn't even make an attempt to link these to any crime or charges at all. Nor did he explain why he expected to find these in Plaintiff's home.

Verily, even searching Plaintiff's home, Cluley found no firearms at all, only one single bullet, and only two firearm accessories: an unloaded magazine that came with the gun when purchased, and a cloth holster purchased at Walmart.

Cluley did however find writing, which was the obvious intent behind the retaliatory search. Cluley searched through over a dozen notebooks, and over a thousand pages of writing, inside Plaintiff's home, and photographed a dozen pages, none of which could Cluley have possibly believed was relevant to any crime or charges, let alone the allegations at hand.

Cluley's bizarre and intentionally intrusive search didn't stop at the random list that Cluley generated on his warrant affidavit. Cluley used the pretense of the search to go on a photographic frenzy throughout Plaintiff's home - photographing Plaintiff's vehicle inside and out, Plaintiff's car insurance information, Plaintiff's library receipts, Plaintiff's election mail, Plaintiff's prescription medicine, Plaintiff's wallet and ID, Plaintiff's "Vote Libertarian" button, and books from the library and Plaintiff's bookshelf including the *Qur'an*, *Easy Arabic Grammar*, *All the King's Men*, *Economics in One Lesson*, *In Cold Blood*, *Devil in the White City*, the Russian dystopian novel *We,* and others.

Cluley also took multiple photos of Plaintiff's bathroom (including cabinets, closets, the sink and under the sink), bedroom (including clothes), basement, kitchen (including the refrigerator and freezer, inside and out, the pantry, the sink, and the kitchen table), office (including the filing cabinet, desk, and desk drawers) and living room.  A proof sheet of these photos provided by the Defense is attached as *Exhibit N.*

How could Cluley possibly believe any of these 92 photos related to Jessica James's claims at all? He couldn't. No reasonable officer could. The purpose was purely and solely to violate Plaintiff's inner sanctum and demonstrate what the Police could and would do to someone who dared speak out against them. Case Law from this circuit clearly establishes the unconstitutionality of this type of search:

The ruling in *Ellison v. Balinski, 625 F.3d 953, 959 (6th Cir. 2010)* reads so similar to Cluley's conduct that it may as well be describing this exact case. In that case, as in this one, an officer obtained a search warrant for an extremely vague set of purported evidence, yet made no attempt to connect it to the alleged charges at hand, or any crime at all. Most notably, in that case, as in this one, the officer sought evidence "pertaining to" Plaintiff. This is the exact language Cluley used in his affidavit: "Writing pertaining to (Plaintiff's) thought process."
The court ruled thusly:

*"Here, a jury could reasonably determine that this affidavit—mentioning no specific crimes thought probably committed, making no link between Plaintiff's residence and any crime, yet seeking broad authority for a search of Plaintiff's entire residence for any document 'pertaining to' Plaintiff—was so lacking in indicia of probable cause to render Defendant's belief in its existence objectively unreasonable. Accordingly, the district court was correct to deny Defendant's motion for judgment as a matter of law." Ellison v. Balinski, 625 F.3d 953, 959 (6th Cir. 2010)*

This precedent is the most obvious and most clearly mirrors the current case, however it's not the only one that clearly established what Cluley did was clearly established as unconstitutional.

In *Armstrong v. City of Melvindale, 432 F.3d 695, 700 (6th Cir. 2006)*  the court ruled on documents that obviously had no link to any crime:

*"Though Defendants may have had probable cause to believe the ownership documents would be found on the Melvindale premises, no probable cause existed to believe the documents themselves evidenced a crime. Although Armstrong asserted an ownership interest in the seized computers, the officers did not seek to obtain the warrant on the strength of any link between those ownership documents and a crime. Because the object of Defendants' search—the ownership papers—lacked any evident criminal link, the search was unconstitutional and Defendants violated Plaintiffs' Fourth Amendment rights by conducting it." Armstrong v. City of Melvindale, 432 F.3d 695, 700 (6th Cir. 2006)*

In *Groh v. Ramirez, 540 U.S. 551, 552, 563 (2004),*  the court again ruled on the facial

unconstitutionality of a warrant lacking particularity:

*"It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted. Because petitioner did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly unreasonable under the Fourth Amendment. . . . Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." Groh v. Ramirez, 540 U.S. 551, 552, 563 (2004)*

Finally, in *Wheeler v. City of Lansing, 660 F.3d 931, 942 (6th Cir. 2011)* the court ruled on including things to be searched for and seized within a warrant, but without identifying the alleged evidence in the warrant affidavit and supporting it with probable cause:

*"Wirth is not entitled to qualified immunity from this aspect of Wheeler's claim, as it would be apparent to a reasonable officer that listing general categories of items to be seized even though further details are available violates the Fourth Amendment's specificity requirement. "*

And

*" Further, we can assume for the sake of this qualified-immunity analysis that Wheeler's Fourth Amendment rights were violated when officers seized items that were identified in the warrant but not supported by probable cause in the warrant affidavit." Wheeler v. the City of Lansing, 660 F.3d 931, 938-39 (6th Cir. 2011)*

This includes the entirety of evidence that Gregg Cluley listed to be searched for and seized, including the photographs of Plaintiff's writing  - direct and exact copies that make taking the writing not just a search but also a seizure.

**Conclusion**

In conclusion, based on the clearly established facts in the evidence of record, the totality of the circumstances of events, and the precedent clearly established by the US Constitution and the Sixth Circuit Court, Plaintiff's claims against Defendant Officers Josh Mowery, Gregg Cluley, Ben Skinner, and Ryan Gabriel should be granted as a matter of Summary Judgment and this motion and memorandum in support should be granted.

*Submitted with respect,*

**/s/Andrew Smigelski_____**
**Andrew Smigelski, Plaintiff Pro Se**
**1015 Bryan Road**
**Sugar Grove, Ohio 43155**
**614-607-1230**
**Smigelski.Andy@gmail.com**