UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANDREW SMIGELSKI,

      Plaintiff,

  v.

GREGG CLULEY, *et al.*,

      Defendants.

:

Case No. 2:20-cv-4812
Judge Sarah D. Morrison
Magistrate Judge Kimberly A. Jolson

:

:

## OPINION AND ORDER

This matter is before the Court on four summary judgment motions, which are all ripe for review: (1) Defendant Josh Mowery's Motion for Summary Judgment (ECF No. 101); (2) a Motion for Summary Judgment filed by Defendants Gregg Cluley, Ryan Gabriel, and Ben Skinner (ECF No. 103); (3) Defendant Lisa Brooks' Motion for Summary Judgment (ECF No. 105); and (4) Plaintiff Andrew Smigelski's Motion for Summary Judgment (ECF No. 133).

For the reasons stated below, Defendants' Motions are **GRANTED**. Mr. Smigelski's Motion is **DENIED**.

    **I.**    **FACTUAL BACKGROUND**

Mr. Smigelski and his neighbors were involved in a heated dispute about his neighbors' support for law enforcement. The dispute escalated, leading to Plaintiff's arrest and conviction for menacing, a fourth degree misdemeanor. The Hocking County Municipal Court sentenced Mr. Smigelski to a fine and two years of probation. *See State v. Smigelski*, No. 19CA6, 2019 WL 5797340, 2019-Ohio-4561

at ¶ 1 (Ohio Ct. App. 4th Dist. Nov. 1, 2019) (affirming conviction on appeal). Mr. Smigelski then filed this § 1983 action against more than 20 defendants including his neighbors, local officials, and the FBI.

The Ohio Fourth District Court of Appeals summarized the events that precipitated Mr. Smigelski's lawsuit:

> {¶4} Appellant [Mr. Smigelski] became involved in a dispute with his neighbors, the James family, that resulted in him being arrested and charged with inducing panic, menacing, resisting arrest, and obstructing official business. The menacing charge arose from his dispute with the James family. The additional charges arose when police arrested Appellant at his house on the menacing charge.
>
> {¶5} Shortly after his arrest, the State dismissed the inducing panic charge and amended the menacing charge to aggravated menacing. The State also served a warrant on Appellant to search his home. Appellant filed a motion to suppress evidence alleging that the search warrant was invalid on its face, which the State conceded at the suppression hearing. However, even though the court granted Appellant's motion to suppress, it does not appear that ruling had any practical effect regarding Appellant's case because none of the charges pending at the time (aggravated menacing, obstructing official business and resisting arrest) were dismissed after the motion was granted. Appellant waived his right to a jury trial and a bench trial ensued.
>
> {¶6} The State's first witness was Appellant's neighbor, Mrs. Jessica James, who testified that the day after putting a blue bulb in their porch light in support of two slain Westerville police officers, a sign appeared in their front yard that said "you must have a small penis," which included a drawing of male genitalia. She testified that she took the sign to the Logan Police Department.
>
> {¶7} Mrs. James testified that approximately six months later on Monday, September 10, 2018, she and her family were outside when Appellant twice came out of his house, walked up the street and held up his phone like he was taking a video of them. Mrs. James testified that the next day, September 11th, she and her children were returning home when they saw Appellant "screaming and yelling" that he wanted his sign back. Mrs. James testified that led to a verbal exchange with Mrs. James making statements in support of our military and police and Appellant making statements against them, including accusations that

2

members of Hocking County law enforcement committed rape and theft. Mrs. James testified that Appellant told her that because her family supported the "thin blue line," she and her children would "get what was coming to us." Mrs. James testified that Appellant was "very aggressive and confrontational" during this discussion and it scared her. Mrs. James testified that she reported the incident and the theft of their light bulbs to the Logan Police Department.

{¶8} Mrs. James testified that the next morning as she came out of her house Appellant was on his porch again appearing to take video of her and said "this is the person who threatened me yesterday." She testified that she told Appellant that her family had friends and family in law enforcement. Mrs. James also reported this incident to the Logan police. Mrs. James' complaint was taken by Officer Mowery, who had gone through the police academy with her husband.

{¶9} On cross examination, Mrs. James was asked if Appellant's actions of going in and out of his house scared her. Mrs. James testified that Appellant's actions did not scare her, but they confused her. However, on re-direct examination, Mrs. James testified and clarified that she was fearful on the occasion when Appellant told her that she and her children would get what they had coming.

{¶10} The State's next witness was Mr. Kenneth James, who testified that on September 11th Appellant was yelling and calling Mrs. James names like "fat whore and a bitch and everything." Mr. James testified that Appellant wanted his sign back. Mr. James also testified that Appellant was disparaging the military and police. Mr. James testified that Appellant became very aggressive toward his wife and looked at the James's and said "you and your kids will get what's coming to you."

{¶11} The State's next witness was Officer Josh Mowery of the Logan Police Department, who testified that on September 12th he wrote up Mrs. James' complaint that alleged that the day before Appellant had threatened her by stating that "her and her children would get what they had coming to them." The State then began playing video from Officer Mowery's body camera. The footage apparently showed Officer Mowery approaching Appellant's home regarding the James's complaint. The video showed Officer Mowery stating that he could see a hand gun on Appellant's couch so he asked Appellant to come out of his house, which Appellant refused to do. Consequently, Officer Mowery testified that he requested the SRT (Special Response Team).

{¶12} The video showed Officer Mowery instructing Appellant to come out because he was going to be arrested for menacing. The video showed

3

> Appellant refusing to come out of his house and claiming he had done nothing wrong. The video showed Officer Mowery informing Appellant that if he did not come out additional charges could be filed. The video showed that after the SRT team arrived, a sheriff's deputy negotiated with Appellant through his front door.

*Smigelski*, 2019-Ohio-4561 at ¶¶ 4–12. The events that transpired from there are central to this lawsuit and are no secret; the events were captured on video footage from various officers' bodycams at numerous angles.[1]

The Hocking County Deputy[2] negotiated with Mr. Smigelski, and explained to Mr. Smigelski that additional officers had arrived because of the gun on the couch. (Smigelski Ex. K, 0:35–0:40, ECF No. 123.) Eventually, the Deputy convinced Mr. Smigelski to go out onto the porch to write a statement. (*Id.* 17:00–17:20.) Mr. Smigelski had been inside of his home for approximately 25 minutes since Officer Mowery's arrival. (Smigelski Exs. J, K, ECF No. 123; *Smigelski*, 2019-Ohio-4561 at ¶ 13.)

The gun remained on Mr. Smigelski's couch when he exited onto the porch. (*Id.*) Mr. Smigelski later corroborated Officer Mowery's and the Deputy's

---

[1] Given the voluminous amount of video footage, the Court relies heavily on that footage to resolve any factual disputes between the parties. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (establishing the high value of video footage in resolving factual disputes between the parties); *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *7 (6th Cir. Mar. 15, 2023) (Readler, J., concurring in part and dissenting in part) (explaining that "[w]ith the benefit of body camera video capturing the relevant events, the parties' respective descriptions of the engagement take a back seat" and courts "'view the facts in the light depicted by the videotapes.'") (citing *Rudlaff v. Gillespie*, 791 F.3d 638, 639 (6th Cir. 2015) (cleaned up)).

[2] The Deputy's name is not part of the record, so the Court refers to him as "the Deputy."

4

observations of the gun; he testified his firearm was in the room with him when Officer Mowery and the Deputy were on his porch (ECF No. 103-1, 119:1–24), and agreed that "it was probably no more than 5 to 10 feet away" from him. (*Id.* 119:15–20.)

Once on the porch, Mr. Smigelski sat down to write his statement. (Smigelski Ex. K at 17:10–35.) The Deputy stayed on the porch while Mr. Smigelski wrote and talked, telling the Deputy about his dispute with his neighbors and his mistrust of law enforcement. (Cluley Ex. 2, 12:23:50–12:26:40, ECF No. 107; Mowery Ex. D, ECF No. 101-4.) Officer Mowery joined Mr. Smigelski and the Deputy on the porch after some time passed. (*Id.*) The Deputy then explained to Mr. Smigelski that Officer Mowery believed he had probable cause to arrest Plaintiff for menacing, and Mr. Smigelski asked "what's your probable cause." (Mowery Ex. D.) Officer Mowery replied "we're not going to have court on the porch." (*Id.*) Officer Mowery then told Mr. Smigelski to stand up because he was under arrest, but Mr. Smigelski remained seated and began yelling at the Deputy, "You lied to me! You fucking lied to me! You said you wouldn't lie and you fucking lied to me!" (*Id.* 0:23–0:30.) The Deputy responded by saying he would take Mr. Smigelski's phone so it wouldn't break and tried to calm Mr. Smigelski by saying "let's not fight." (*Id.* 0:35–40.)

At that point, Mr. Smigelski stood up with his left arm behind his back, continuing to hold his phone in his right hand and yelling at the Deputy. (Mowery Ex. C, ECF No. 101-3.) Officer Mowery and another officer then pulled Plaintiff to the ground to effectuate the arrest. (*Id.*) Mr. Smigelski was first in an upright

5

sitting position on the ground, before Officer Mowery pushed him to the ground by his head and neck area amidst Plaintiff's screams. (Mowery Ex. G, 12:30:15–45, ECF No. 101-7.) Once Mr. Smigelski was prone on the ground, Officer Mowery yelled "get your hands behind your back!"; Mr. Smigelski screamed "stop" over and over with his hands beneath his body. (*Id.*)

Next, Captain Gabriel and Detective Skinner ran up to porch where Mr. Smigelski was on the ground. (Smigelski Ex. M, 12:30:10–35; Cluley Ex. 2, 12:30:16–35, ECF No. 107.) Captain Gabriel assisted in pulling Mr. Smigelski's hands behind his back for cuffing. (*Id.*) Detective Skinner briefly held his taser on Plaintiff's back, but did not discharge it. (Smigelski Ex. M, 12:30:25–40; Cluley Ex. 2, 12:30:16–35.)

The officers told Mr. Smigelski to stop resisting, to relax, and to breath. (*Id.*) About 30 seconds passed from the time Officer Mowery took Mr. Smigelski down to the ground to the time Mr. Smigelski was cuffed and standing. (*Id.*)

Mr. Smigelski then allowed the Deputy to retrieve the gun from his house while he watched before he was placed in a police vehicle. (Smigelski Ex. M, 12:31:20–32:60.)

## II. PROCEDURAL BACKGROUND

Mr. Smigelski initiated this lawsuit on September 14, 2020. (ECF No. 1.) He is proceeding *pro se* and *in forma pauperis*. (R&R, ECF No. 7.) After an initial screen pursuant to 28 U.S.C. § 1915(e)(2), the Magistrate Judge recommended that Mr. Smigelski be permitted to proceed with his claims against: (1) Unnamed Southeastern Ohio Regional Jail ("Southeastern Jail") Guards (in their personal

6

capacities) for their alleged unconstitutional collection of his DNA; (2) Lt. Cluley (in his personal capacity) for his alleged misrepresentations in obtaining a search warrant; and (3) Mowery, Skinner, and Gabriel (in their personal capacities) for their alleged excessive force against him. (R&R, PageID 110.) The Court ordered Plaintiff to amend his complaint to include specific relief requested from each defendant and recommended that Mr. Smigelski's remaining claims be dismissed. (*Id*. PageID 110–11.) This Court adopted the R&R after no party objected. (ECF No. 9.)

Mr. Smigelski filed his Second Amended Complaint on May 7, 2021.[3] (SAC, ECF No. 40.) The parties engaged in discovery and filed their Motions. The Court will address the pending motions in reverse order of the claims.

### III. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."

---

[3] In his Second Amended Complaint, Mr. Smigelski identifies the Southeastern Jail guard as "Brooks." (SAC, PageID 248.)

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV. EXCESSIVE FORCE CLAIM—COUNT III

Mowery, Skinner, and Gabriel argue qualified immunity bars Mr. Smigelski's claims against them for excessive force. (ECF No. 101, PageID 670; ECF No. 103, PageID 775.)

"When a defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment." *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). Qualified immunity is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

8

Government officials are shielded so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At summary judgment, qualified immunity does not apply if the facts, viewed in a light most favorable to plaintiff, would permit a reasonable juror to find that (1) an officer used excessive force and violated a plaintiff's constitutional rights, and (2) the right was clearly established and one of which a reasonable officer would have known. *Id.* 818–19.

At summary judgment, the relevant inquiry is whether Mr. Smigelski presented sufficient evidence to create a genuine issue of material fact as to whether his Fourth Amendment rights were violated by the officers and whether such rights were clearly established. *Osborn*, 2023 WL 2523307, at *3. If plaintiff presents sufficient evidence to create a genuine issue of material fact as to both of these questions, qualified immunity must be denied and disputes must be reconciled by the fact-finder. *Id.* (citing *Hernandez v. Boles*, 949 F.3d 251, 258–59 (6th Cir. 2020)).

The Court examines each defendant's conduct in turn. Because the Court concludes the force each used was reasonable and not excessive, they are all entitled to qualified immunity. Consequently, the Court need not address prong (2) of the qualified immunity analysis. *See Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) ("These two prongs [(steps)] may be addressed in any order. If either prong is

9

not met, then the government officer is entitled to qualified immunity") (citation omitted).

### A.  Officer Mowery

Plaintiff's excessive force claim against Officer Mowery has two parts. Mr. Smigelski alleges the force Officer Mowery used in effectuating the arrest was excessive. (SAC ¶¶ 35–37.) He also alleges the tightness of the handcuffs applied to him by Officer Mowery was excessive.[4] (SAC ¶ 38.)

#### 1.  *Effectuating the Arrest*

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 388 (1989). When an officer uses force to apprehend a person, it constitutes a "seizure," and so the force must be reasonable and not excessive to be constitutional. *Torres v. Madrid*, 141 S. Ct. 989, 993 (2021); *Stewart v. City of Euclid*, 970 F.3d 667, 672 (6th Cir. 2020); *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

Whether a seizure constitutes a Fourth Amendment violations hinges on "'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances." *Graham*, 490 U.S. at 397. Qualified immunity is inappropriate on

---

[4] Mr. Smigelski spends much of his opposition brief arguing about the legality of his arrest and whether law enforcement had probable cause to arrest him. (ECF No. 120.) These arguments are unrelated to his remaining claims, and he was already convicted of menacing in state court. *Smigelski*, 2019-Ohio-4561. As the Magistrate Judge explained, federal law prohibits a plaintiff from collaterally attacking a state law conviction through a § 1983 lawsuit, *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), and therefore Mr. Smigelski's assertions attempting to do so are meritless. (*See* R&R, PageID 106.)

an excessive force claim where an officer's use of force was objectively unreasonable, which turns on: (1) "the severity of the crime at issue," (2) whether the individual posed an immediate safety threat, and (3) whether the individual was "actively resisting arrest or attempting to evade arrest[.]" *Id.* at 396; *see also Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017) (citing *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)). To determine whether the force was excessive, courts look at the reasonableness of the force "in light of the totality of the circumstances confronting the defendants." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (citing *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)).

Officer Mowery argues the force he used to effectuate the arrest was not excessive because Mr. Smigelski resisted arrest by initially remaining seated, protesting his arrest, not giving up his right arm for cuffing, and then screaming and clutching his arms beneath his prone body. (ECF No. 101, PageID 672.)

For his part, Mr. Smigelski disputes that he was resisting arrest. He argues he was "verbally protesting the false arrest, while he was physically complying as quickly as possible while trying to understand the developing situation." (ECF No. 120, PageID 1214.) He argues that it was not until he complied and placed his hands behind his back that "Mowery attacked the Plaintiff by jerking his collar down and slam-throwing Plaintiff against his home," and then "slamming Plaintiff's head and neck down into the concrete." (*Id.*)

Considering the totality of the circumstances, Officer Mowery's use of force to effectuate the arrest was objectively reasonable. The severity of the crime Mr.

11

Smigelski was being arrested for was low (menacing, a misdemeanor), but it was a tense situation in which the officers were understandably alert. Mr. Smigelski refused to exit his home for more than 25 minutes after Officer Mowery arrived and announced Plaintiff was being arrested for menacing. Mr. Smigelski had a firearm five to 10 feet from his person, and Officer Mowery and the Deputy saw the firearm. Even when Mr. Smigelski was on the porch for several minutes, his behavior was erratic. Mr. Smigelski was more than outnumbered both in bodies and size when the SRT arrived. But the firearm, coupled with Mr. Smigelski stated mistrust of law enforcement and repeated, angry protestations that he did nothing wrong indicated that Mr. Smigelski posed an immediate safety threat.

Even when Mr. Smigelski finally stood with his left hand behind his back, he continued to resist by not giving up his right hand and arguing with the Deputy. Perhaps had Officer Mowery waited a few more moments, he would not have had to utilize a takedown. But by that time, more than 30 minutes had passed, and the Court cannot view the events that transpired "with the 20/20 vision of hindsight," but rather "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

Once he had Plaintiff on the ground, Officer Mowery used only the force necessary to get Mr. Smigelski's hands behind his back for cuffing. That force was not excessive; Plaintiff was back on his feet talking to and shouting at the officers less than one minute after he had been taken down. *See, e.g., Earnest v. Genesee Cnty.*, 841 F. App'x 957, 960 (6th Cir. 2021) (explaining that where a deputy sheriff

12

utilized a takedown to subdue the plaintiff and "manually forcing his hands behind his back so that they could be handcuffed," the force was objectively reasonably).

Officer Mowery's Motion is **GRANTED** on Mr. Smigelski's excessive force while effectuating arrest claim.

    2.  *Handcuff Tightness*

Mr. Smigelski's excessive force claim based on handcuff tightness fairs no better.

The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure. *Morrison v. Bd. of Tr. of Green Twp.,* 583 F.3d 394, 400 (6th Cir.2009). For a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that (1) he complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) (citing *Morrison*, 583 F.3d at 401).

From the Court's review of the video footage, at no time while Officer Mowery was on the scene did Mr. Smigelski complain about the tightness of his handcuffs. (Mowery Ex. E, 12:30:40–12:32:52, ECF No. 101-5.) Mr. Smigelski offers no evidence to the contrary. This deficiency is fatal to his claim.

Officer Mowery's Motion is **GRANTED** on Mr. Smigelski's excessive force claim based on handcuff tightness.

### B. Captain Gabriel

Nor was the force used by Captain Gabriel objectively unreasonable. He was not on the porch at the time of Mr. Smigelski's take down. (Smigelski Ex. M, 12:30:10–35; Cluley Ex. 2, 12:30:16–35.) Captain Gabriel's involvement was limited to moving Mr. Smigelski's hands behind his back to assist in handcuffing the Plaintiff, and courts have found this to be objectively reasonable.[5] *Earnest*, 841 F. App'x at 960; *Mack*, 512 F. Supp. 3d at 793 (no excessive force where police sergeant wrestled defendant's left arm behind his back and got on top of him while defendant was face down on the ground).

Captain Gabriel's Motion is **GRANTED**.

### C. Detective Skinner

Mr. Smigelski argues that Detective Skinner came up while he was on the ground and punched him in the back with a taser. He doesn't dispute that Detective Skinner never discharged the taser. (ECF No. 120, PageID 1212; Mowery Ex. A, 55:6–10, ECF No. 101-1.) Detective Skinner says he placed the taser near Plaintiff and never discharged it. (ECF No. 103, PageID 779.)

---

[5] Mr. Smigelski also argues that Captain Gabriel out-ranked the other officers on the scene and should be accountable in his supervisory role for Officer Mowery's excessive force. (ECF No. 120, PageID 1219.) This argument fails because Mr. Smigelski did not make this claim in his original complaint, and the Magistrate Judge did not allow it to proceed in her Report and Recommendation. Regardless, without an underlying constitutional injury, it would fail. *Mack v. Bessner*, 512 F. Supp. 3d 784, 796 (E.D. Mich. 2021) ("To prove a claim of supervisory liability under § 1983, a plaintiff must show that 'the active performance of the [supervisor's] individual job function . . . directly resulted in the constitutional injury.'") (citing *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487 (6th Cir. 2020)).

14

The bodycam footage resolves this dispute. It shows Detective Skinner approaching Mr. Smigelski's porch after Mr. Smigelski is already on the ground and holding his taser to Plaintiff's back while he is being cuffed. (Smigelski Ex. M, 12:30:25–40; Cluley Ex. 2, 12:30:16–35.) The Sixth Circuit has held that taser use is reasonable where a suspect is actively resisting an officer's attempt to secure his arms behind his back. *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012). Here, Detective Skinner did not discharge his taser. This is not excessive force.

Detective Skinner's Motion is **GRANTED**.

V. **MISREPRESENTATIONS IN OBTAINING A SEARCH WARRANT— COUNT II**

Lt. Cluley argues that he too is entitled to qualified immunity because Mr. Smigelski does not have any evidence that he knowingly or recklessly made false statements in his affidavit in support of his search warrant. (ECF No. 103, PageID 782.) Lt. Cluley explains that he was assigned to request and obtain a search warrant for Mr. Smigelski's residence, he prepared the affidavit in support of the search warrant, and the information contained in the affidavit was based largely upon information that was relayed to him by Officer Eli Burchfield (who is not a defendant in this case). (Cluley Decl. ¶¶ 6–8, ECF No. 103-2.) Lt. Cluley states he believed the information relayed to him was true and accurate, and he did not have any reason to disbelieve Officer Burchfield. (*Id.* ¶¶ 12–13.) Finally, Lt. Cluley points out that, during Mr. Smigelski's deposition, Mr. Smigelski stated that he didn't

15

"have enough evidence" as to his claim against Lt. Cluley. (ECF No. 103-1, 115:3–116:14.)

Mr. Smigelski counters that there are "obvious lies" on the face of the warrant including that he had opened the door with a handgun and had a knife on his person. (ECF No. 120, PageID 1219.) He argues that Lt. Cluley is "now attempting to cover up for his previous falsified affidavit by swearing another false affidavit" and is trying to shift blame to Officer Burchfield. (*Id.*)

Officers are generally "entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." *Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243 (6th Cir. 1989). The exception to this general rule provides that "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Id.*; *Marvaso v. Sanchez*, 971 F.3d 599, 610 (6th Cir. 2020). "Only deliberate falsehood . . . or reckless disregard for the truth should make an officer ineligible for qualified immunity." *Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). Allegations of negligence or innocent mistake are insufficient; a plaintiff must offer evidence of the officer's knowledge or state of mind at the time he wrote the allegedly false affidavit. *Id.* at 418–20.

There were false statements in Lt. Cluley's affidavit in support of the search warrant; he concedes this. (ECF No. 103, PageID 774.) For example, he stated in his

16

affidavit "[u]pon knocking on the door Andrew Smigelski came to the door opening the door, with a handgun, in his hand." (ECF No. 103-2, PageID 809.) The affidavit also states "Andrew Smigelski was detained and [*sic*] knife was removed from his person." (*Id.*) But falsities are not enough. Lt. Cluley declares he believed the information Officer Burchfield relayed to him was true. (Cluley Decl. ¶¶ 12–13.) Mr. Smigelski has not offered any evidence that Lt. Cluley knowingly made false statements or omissions, or made statements with reckless disregard for the truth. He confirmed that he has no evidence of these things during his deposition. (ECF No. 103-1, 115:3–116:14.)

Lt. Cluley's Motion is **GRANTED**.

### VI. UNCONSTITUTIONAL COLLECTION OF DNA—COUNT I

Mr. Smigelski asserts his DNA was improperly collected by unnamed guards at Southeastern Jail because he was charged with a misdemeanor and Ohio law mandates DNA collection only from felony arrestees. (SAC ¶¶ 100–103; R&R, PageID 108); *see also* Ohio Rev. Code § 2901.07(B)(1)(a).

Defendant Lisa Brooks moves for summary judgment arguing, *inter alia*, that Southeastern Jail was required to take a DNA sample from Mr. Smigelski under Ohio law because he was arrested for a felony. (ECF No. 105, PageID 959, 961–62.) Attached to her motion as an exhibit is Mr. Smigelski's Inmate Intake Form; an inmate intake form is used for warrantless arrests to inform the jail of the charges which were the basis for the arrest. (Inmate Intake Form, ECF No. 105-2; Vanbibber Aff. ¶ 3, ECF No. 105-1.) Mr. Smigelski's Form indicates he was charged

17

with aggravated menacing in violation of Ohio Revised Code § 2903.21 (a first degree misdemeanor) and inducing panic in violation of Ohio Revised Code § 2917.31 (a third degree felony). (Inmate Intake Form.) The Ohio Fourth District Court of Appeals explained that the inducing panic charge was added in connection with the events surrounding Mr. Smigelski's arrest, and the charge was later dismissed. *Smigelski*, 2019-Ohio-4561 at ¶¶ 4–5.

Mr. Smigelski offers no evidence refuting the Inmate Intake Form or Ms. Brooks' reliance on the same. Nor does he cite any authority that the DNA collection was unconstitutional or that Ms. Brooks could not reasonably rely on the Form to gather the collection. *Contra Maryland v. King*, 569 U.S. 435 (2013) ("DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure."); *Chattams v. Warden, Lebanon Corr. Inst.*, No. 1:13-CV-205, 2014 WL 3899284, at *6 (S.D. Ohio Aug. 11, 2014) (explaining the *Maryland* Court's holding); *State v. Cremeans*, 825 N.E.2d 1124, 1126 (Ohio Ct. App. 2d. Dist. 2005) ("Appellate courts reviewing Fourth Amendment challenges to [statutes like Ohio Revised Code § 2901.07] uniformly have held that mandatory collection of DNA samples from individuals such as [the defendant] does not constitute an unlawful search and seizure"). Thus, Ms. Brooks' motion for summary judgment on Mr. Smigelski's unconstitutional collection of DNA claim is **GRANTED**.

### VII. CONCLUSION

Defendants' Motions for Summary Judgment (ECF Nos. 101, 103, 105) are **GRANTED**. Mr. Smigelski's Motion is **DENIED**. (ECF No. 133.) The Clerk is

**DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

    **IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**